2021 UT 28

IN THE

# SUPREME COURT OF THE STATE OF UTAH

JACOB M. SCOTT,
*Appellant,*

*v.*

WINGATE WILDERNESS THERAPY, LLC,
*Appellee.*

No. 20190953
Heard November 17, 2020
Filed July 9, 2021

On Certification from the
United States Court of Appeals for the Tenth Circuit
The Honorable Timothy M. Tymkovich
No. 19–4052

United States District Court for the District of Utah
The Honorable David Nuffer
No. 4:18-CV-00002-DN

Attorneys:
John D. Luthy, Brandon J. Baxter, Logan, for appellants

Andrew M. Morse, Nathan A. Crane, Dani N. Cepernich,
Salt Lake City, for appellees

JUSTICE PEARCE authored the opinion of the Court in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE LEE,
JUSTICE HIMONAS, and JUSTICE PETERSEN joined.

JUSTICE PEARCE, opinion of the Court:

## INTRODUCTION

¶1    The United States Court of Appeals for the Tenth Circuit has a question about the reach of the Utah Health Care Malpractice Act (Malpractice Act or Act), UTAH CODE §§ 78B-3-401 through 426. *See Scott v. Wingate Wilderness Therapy, LLC*, 792 F. App'x 590, 591 (10th Cir. 2019). The Tenth Circuit wants to know if the Act applies to a claim that Jacob Scott brought seeking relief for injuries he sustained as a minor while rock climbing during a "wilderness therapy" hiking

excursion. *See id.* The Tenth Circuit certified the question to this court, and we agreed to answer.

¶2    We conclude that an injury sustained while climbing a rock formation during a "wilderness therapy" excursion can, depending on the circumstances, "relat[e] to or aris[e] out of health care rendered . . . by [a] health care provider." *See* UTAH CODE § 78B-3-403(17). And we conclude that the injury at the heart of the claims here related to or arose out of treatment a health care provider rendered. As such, the Act applies to the claims the plaintiff asserts.

## BACKGROUND

¶3    We state the facts and procedural history as the United States District Court and Tenth Circuit described them. *See Scott v. Wingate Wilderness Therapy, LLC* (*Scott II*), 792 F. App'x 590 (10th Cir. 2019); *Scott v. Wingate Wilderness Therapy, LLC* (*Scott I*), No. 4:18-CV-0002-DN, 2019 WL 1206901 (D. Utah Mar. 14, 2019).

¶4    The plaintiff-appellant in the underlying federal case, Jacob M. Scott (Jacob), was injured while rock climbing under the supervision of the defendant-appellee, Wingate Wilderness Therapy, LLC (Wingate).[1] *Scott II*, 792 F. App'x at 591. At the time, Jacob was a participant in Wingate's "wilderness therapy" program. *Id.*

### *Wingate's Program*

¶5    Wingate provides "wilderness therapy" to adolescents. *Id.* Wingate operates as an "outdoor youth program" licensed by the Utah Department of Human Services to provide "behavioral, substance abuse, [and] mental health services" to minors. *See Scott I*, 2019 WL 1206901, at *1–3 (alteration in original) (citing UTAH CODE § 62A-2-101);[2] *see also* UTAH ADMIN. CODE r. 501-8.[3]

---

[1] We note that Wingate, in its briefing to us, refers to itself as "WinGate." Both the Tenth Circuit and the district court used the spelling, "Wingate." We adopt the courts' spelling here for consistency. *See Scott II*, 792 F. App'x 590; *Scott I*, 2019 WL 1206901.

[2] The statute in effect during the relevant time, March 2015, permitted such "youth program[s]" to "provide behavioral, substance abuse, or mental health services to minors" who are "adjudicated or nonadjudicated." UTAH CODE § 62A-2-101(32) (2014). These services could be "in the outdoors" and the programs could "limit or censor access to parents or guardians" and "prohibit[] or restrict[] a minor's ability to leave the program at any time." *Id.* The

(continued . . .)

¶6 Persons enrolled in Wingate's program "live in the wilderness during their time at Wingate" and participate in "hiking and camping, as well as individual and group therapy." *Scott II*, 792 F. App'x at 591.[4] State regulations require Wingate, as an "outdoor youth program," to employ "clinical and therapeutic personnel," and require those personnel to be licensed or working under a state-certified training program. *See* UTAH ADMIN. CODE r. 501-8-6(8). Wingate employs "various professionals, including licensed therapists and psychologists," who conduct therapy sessions and create "treatment plan[s]" for participants. *Scott II*, 792 F. App'x at 591–92.

¶7 Wingate also employs field staff who lead hiking and wilderness activities. *See id.* at 592. Wingate's briefing asserts that its field staff "implement the treatment plans prepared for the patient-residents by licensed health care providers." Both parties agree that Wingate's "field staff are not licensed therapists or medical doctors." Both parties also agree that the field staff are nevertheless subject to Utah Department of Human Services regulations, which require that all field staff, at a minimum, be: "annually trained and certified in CPR and currently certified in standard first aid," UTAH ADMIN.

---

legislature amended the statute in 2021 to define "outdoor youth program[s]" as providing "regular therapy, including group, individual, or supportive family therapy" in "a 24-hour outdoor group living environment" to minors who have "a chemical dependency" or a "dysfunction or impairment that is emotional, psychological, developmental, physical, or behavioral." UTAH CODE § 62A-2-101(33) (2021). We analyze and cite to the statute in effect in March 2015.

[3] The regulations define "Outdoor Youth Program," as "a 24-hour intermediate outdoor group living environment with regular formal therapy including group, individual, and the inclusion of supportive family therapy." UTAH ADMIN. CODE r. 501-8-3(1)(d).

[4] Jacob describes Wingate's program as bifurcated into a "wilderness experience" and "traditional counseling," with the two components being operated by different staff—"field staff" and a "clinical team." Wingate, on the other hand, asserts that its "wilderness therapy therapeutic process" encompasses not only "traditional" counseling with psychologists and licensed counselors, but also the "immersive experience in the wilderness," including hiking.

CODE r. 501-8-6(3)(h), (4)(c), (5)(d), (6)(e); experienced in "recreational therapy," *id.* 501-8-6(2)(d), (3)(d); and trained and demonstrate "proficiency" in "counseling, teaching and supervisory skills," "conflict resolution[] and behavior management," as well as "safety procedures and safe equipment use," "wilderness medicine," "CPR," and "standard first aid." *Id.* 501-8-8(2).

*Jacob's Treatment Plan*

¶8 When Jacob was seventeen, his parents enrolled him in Wingate's wilderness therapy program. *Scott II*, 792 F. App'x at 592. Toward the beginning of his stay, Jacob met with a licensed marriage and family therapist Wingate employed (Therapist or Wingate's Therapist). *Id.* The Therapist created a written "treatment plan" for Jacob:

> Jacob [will] participate in weekly individual and group therapy as well as daily psychoeducational and process groups. He will be immersed in wilderness principles and experiences, and will have the opportunity to learn & apply 'Leave No Trace' principles throughout his outdoor experience at WinGate. He will have the opportunity to learn outdoor survival skills as well as a variety of methods for making and utilizing primitive tools, instruments, and shelters. Jacob will be introduced to new philosophies and strategies to assist him in creating a more effective path for himself and for his family relationships.

*Id.* Later, in a sworn statement, the Therapist "described the treatment plan as providing for, 'among other things, weekly individual and group therapy sessions, daily psychoeducational and process groups, hiking (exercise), and recommended a stay in the therapeutic program for eight weeks.'" *Id.* (citation omitted). Neither the written treatment plan nor the Therapist's deposition testimony mention climbing as a component of Jacob's therapy.

*The Climbing Accident and Injury*

¶9 Two weeks into Wingate's program, Jacob and six other youths went hiking, accompanied by two Wingate staff members. *Id.* During the hike, the lead staff member temporarily left the group.[5]

---

[5] State regulations require Wingate to have "at least two staff members" supervising each "youth group" "at all times," UTAH

(continued . . .)

*Id.* The remaining staff member let the youth, at their request, climb a "seventy-foot-tall, snow-dusted rock formation." *Id.* at 591. The staff member provided no climbing gear, training, or physical assistance. *Id.* at 591–92. Jacob and three others reached the top, "but Jacob and at least one other boy found it much more difficult to climb back down." *Id.* at 592. While Jacob was struggling to descend the rock formation, the lead staff member rejoined the group. *Id.* "Neither staff member offered Jacob any physical assistance, but one of them advised Jacob to follow a certain route down. As Jacob tried to do so, he slipped on the snow and fell approximately twenty-five feet to the ground, landing on his left knee." *Id.* Jacob's knee shattered. *Id.* at 591.

### The Negligence Claim

¶10  Three years after the accident and more than two years after Jacob's eighteenth birthday, Jacob filed a lawsuit against Wingate in federal district court. *Id.* at 592–93. Jacob alleged that Wingate breached its duty of care to him by:

> (i) allowing the youth to take a detour from the designated route; (ii) allowing the lead staff member to leave the group with only one staff member remaining with the group; (iii) not doing anything to determine whether the climbing of the rock formation would be safe for the youth; (iv) not properly assessing the danger of allowing the youth to climb the rock formation; (v) allowing the youth to climb the dangerous rock formation without supervision; (vi) allow[ing] the youth to climb the dangerous rock formation without any safety gear; (vii) not assisting Jacob with his descent down the rock formation[;] and (viii) instructing [Jacob] to climb down the rock formation when and where it was dangerous to do so.

*Id.* at 593 (alterations in original) (quoting *Scott I*, 2019 WL 1206901, at *2).

### District Court Dismissal

¶11 The federal district court granted Wingate's motion to dismiss. *Scott I,* 2019 WL 1206901, at *5. The court concluded that the Malpractice Act applied to Jacob's claims and that Jacob had failed to

---

ADMIN. CODE r. 501-8-7(1), and meet certain specifications for the provision of clothing and protective equipment. *Id.* 501-8-5(5)–(6).

file his action within the two-year statute of limitations. *Id.* Nor had Jacob complied with the Act's procedural hurdles. *Id.* The court arrived at this conclusion after finding that, under the Act, Wingate is a "health care provider" and Jacob's alleged injury "relates to or arose out of health care" Wingate rendered or should have rendered. *Id.*

¶12 The district court found that Wingate is a "health care provider" under the Act because Wingate employs "several licensed medical and mental health professionals, including clinical social workers, certified social workers, mental health counselors and a psychologist," as well as a "licensed marriage and family therapist" who, the court assumed, "provide[] services that [are] similar to those provided by" health care providers expressly listed in the Act. *Id.* at *3 (citing UTAH CODE § 78B-3-403(12)); *see also id.* at *5. The court also reasoned that Wingate provides "behavioral or mental health services" and, therefore, its services must "relat[e] to or aris[e] out of the health needs of persons or groups of persons." *Id.* at *3 (alterations in original) (citing UTAH CODE § 78B-3-403(12)).

¶13 The district court further found Jacob's alleged injury "relates to or arises out of health care" because Jacob's complaint alleges that, at the time of the injury, Wingate was "attempting to provide behavioral or mental health services" to him. *Id.* at *3 (citation omitted). The court therefore implicitly determined that Jacob's lawsuit constituted a "malpractice action against a health care provider"—an action which is subject to the Act's procedural requirements. *See id.* at *3–5; *see also* UTAH CODE § 78B-3-403(17).

*The Tenth Circuit's Certified Question to the Utah Supreme Court*

¶14 Jacob appealed to the Tenth Circuit, "arguing the district court erred in finding his injuries arose out of health care provided by Wingate." *Scott II*, 792 F. App'x at 591. The Tenth Circuit determined that "the disposition of this appeal turns on an important and unsettled question of Utah law." *Id.* That court noted that "[w]hether and to what extent an injury sustained in the course of 'wilderness therapy' 'relat[es] to or aris[es] out of health care rendered,' within the meaning of the [Act] has yet to be addressed by a Utah state court." *Id.* at 595 (first two alterations in original) (citing UTAH CODE § 78B-3-403(17)).[6]

---

[6] We agree with the Tenth Circuit's observation. Although we have examined whether various claims constituted "malpractice action[s] against a health care provider" under the Act, *see Dowling v.*

(continued . . .)

¶15 The Tenth Circuit certified the following question to us:

> Where Wingate is a "health care provider" under Utah Code § 78B-3-403(12), does an injury sustained by a plaintiff while climbing a rock formation during a "wilderness therapy" program operated by Wingate "relat[e] to or aris[e] out of health care rendered or which should have been rendered by [a] health care provider" within the meaning of the [Malpractice Act]?

*Scott II,* 792 F. App'x at 595 (first three alterations in original).

¶16 In its certification order, the Tenth Circuit clarified the parties' stipulations and the scope of the court's question:

> The parties do not dispute that Jacob failed to satisfy the [Act]'s procedural requirements prior to filing suit. Nor do they dispute that Wingate is a health care provider. The only issue remaining for appeal is whether Jacob's injuries "ar[ose] out of health care rendered or which should have been rendered" by Wingate.

*Id.* at 594 (second alteration in original) (citations omitted).

¶17 The Tenth Circuit further clarified that, although Jacob conceded Wingate is a "health care provider" and provides "health care" when conducting traditional "counseling services," Jacob argued that "wilderness therapy" was "not intended by the Utah Legislature to be treated as health care." *Id.* at 594–95. Jacob alternatively argued that "even if wilderness therapy were included" under the Act's definition of "health care," "unassisted rock climbing is not wilderness therapy," nor is it "health care," nor is it more than "tangentially related to [Wingate's] provision of health care services." *Id.* (alteration in original). Wingate, on the other hand, argued that "Jacob was receiving health care in the form of 'wilderness therapy' when he was injured and therefore his claim plainly falls within the Act's reach." *Id.* at 594.

---

*Bullen*, 2004 UT 50, 94 P.3d 915; *Smith v. Four Corners Mental Health Ctr., Inc.*, 2003 UT 23, 70 P.3d 904; *Platts v. Parents Helping Parents*, 947 P.2d 658, 663 (Utah 1997), we have not yet ruled on the question the Tenth Circuit sent our way.

**STANDARD OF REVIEW**

¶18 When answering a question a federal court certifies to us, "'[t]raditional standards of review do not apply' because we are not asked 'to affirm or reverse a lower court's decision.'" *Fundamentalist Church of Jesus Christ of Latter-Day Saints v. Horne*, 2012 UT 66, ¶ 7, 289 P.3d 502 (quoting *U.S. Fid. & Guar. Co. v. U.S. Sports Specialty Ass'n*, 2012 UT 3, ¶ 9, 270 P.3d 464).[7] Ultimately, "resolution of the parties' competing claims and arguments will be up to the federal courts, which of course retain jurisdiction to decide [the] case." *Id.* ¶ 10. Our role in such a matter "is to resolve disputed questions of state law in a context and manner useful to the resolution of [the] pending federal case." *Id.* ¶ 8. This may require us to "reformulate" the question or provide a "more expansive answer than a literal reading of the certified question." *Id.* ¶ 9 n.2 (citations omitted). Or it may entail "merely answer[ing] the question presented." *Garfield Cnty. v. United States*, 2017 UT 41, ¶ 6, 424 P.3d 46.

**ANALYSIS**

¶19 The Tenth Circuit asks us to interpret certain provisions of the Utah Health Care Malpractice Act, UTAH CODE §§ 78B-3-401 through 426. *Scott v. Wingate Wilderness Therapy, LLC* (*Scott II*), 792 F. App'x 590 (10th Cir. 2019). In its simplest form, the Tenth Circuit's question asks whether Jacob's lawsuit against Wingate is a "malpractice action against a health care provider," such that the suit is subject to the Act's procedural requirements and statute of limitations. *See id.* at 594–95.

¶20 Specifically, the Tenth Circuit's question asks us to presume that Wingate is a "health care provider," and asks us to answer whether "an injury sustained . . . while climbing a rock formation during a 'wilderness therapy' program operated by Wingate 'relat[es] to or aris[es] out of health care rendered or which should have been rendered by [a] health care provider' within the meaning of the [Act]." *Id.* at 595 (third alteration in original) (citation omitted).

¶21 This is a question of statutory interpretation, and so we march down the well-trod path we take when we hope to understand the meaning of statutory language. We look first to the Act's plain language. *See, e.g., Olsen v. Eagle Mountain City*, 2011 UT 10, ¶ 9, 248 P.3d 465; *Dowling v. Bullen*, 2004 UT 50, ¶ 8, 94 P.3d. 915.

---

[7] Article VIII, section 3 of the Utah Constitution vests us with jurisdiction to hear cases certified by the federal courts.

"In [some] cases, the statutory text may not be 'plain' when read in isolation, but may become so in light of its linguistic, structural, and statutory context." *Olsen*, 2011 UT 10, ¶ 9 (citing *Kimball Condos. Owners Ass'n v. Cnty. Bd. of Equalization*, 943 P.2d 642, 648 (Utah 1997)). "[S]ubsections of a statute should not be construed in a vacuum but must be read as part of the statute as a whole." *Dowling*, 2004 UT 50, ¶ 8 (citation omitted). Likewise, "we do not interpret the 'plain meaning' of a statutory term in isolation. Our task, instead, is to determine the meaning of the text given the relevant context of the statute (including, particularly, the structure and language of the statutory scheme)." *Olsen*, 2011 UT 10, ¶ 12.

## I. THE UTAH HEALTH CARE MALPRACTICE ACT

¶22 The Utah Health Care Malpractice Act requires plaintiffs to overcome a set of hurdles before filing a "malpractice action against a health care provider." *See* UTAH CODE §§ 78B-3-401 through 426. In pertinent part, plaintiffs must meet three requirements: First, plaintiffs must give the prospective defendant ninety days' notice of intent to commence the action. *Id.* § 78B-3-412. Second, plaintiffs must present their case to a prelitigation panel, *id.* § 78B-3-416(2)(a),[8] who determines whether the claims have "merit" or "no merit." *Id.* § 78B-3-418(2).[9] Third, plaintiffs must file their complaint within the Act's two-year statute of limitations, unless one of the exceptions applies. *Id.* § 78B-3-404.[10]

---

[8] The Division of Occupational and Professional Licensing provides a panel that must ordinarily consist of a lawyer, a "lay panelist," and one or more "licensed health care providers listed under [the definitions section of the Act], who are practicing and knowledgeable in the same specialty as the proposed defendant." UTAH CODE § 78B-3-416(1)(a), (4).

[9] In 2010, the legislature added a requirement that the plaintiff, prior to filing a complaint, receive a "certificate of compliance" from the Division of Occupational and Professional Licensing. *Vega v. Jordan Valley Med. Ctr., LP*, 2019 UT 35, ¶ 3, 449 P.3d 31. In 2019, this court concluded that the 2010 amendments violated Utah Constitution Article VIII, section I. *Id.* ¶¶ 22–24. We left intact the remaining portions of the Act, including the notice and prelitigation panel requirements. *Id.* ¶ 24.

[10] The notice requirement and statute of limitations have been requirements since the Act was first adopted in 1976. *See* Utah Health Care Malpractice Act, ch. 23, H.B. 35, §§ 4, 8, 1976 Utah Laws 90, 93–

(continued . . .)

¶23 The Malpractice Act applies to any "malpractice action against a health care provider." The Act defines a malpractice action as

> any action *against a health care provider*, whether in contract, tort, breach of warranty, wrongful death, or otherwise, based upon alleged personal injuries *relating to or arising out of health care* rendered or which should have been rendered *by the health care provider*.

*Id.* § 78B-3-403(17) (emphases added). In other words, the Act applies when a plaintiff files suit against a "health care provider," and the alleged injuries "relat[e] to or aris[e] out of health care rendered . . . by the health care provider." *Id.*

¶24　In turn, the Act defines "health care" as

> any act or treatment performed or furnished, or which should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement.

*Id.* § 78B-3-403(10).[11] Breaking that down, "health care" is: an "act or treatment" that was or should have been "performed or furnished": (1) "for, to, or on behalf of a patient"; (2) "during the patient's medical care, treatment, or confinement"; and (3) by a "health care provider." *Id.*

¶25　The Act further defines "health care provider" as

> any person, partnership, association, corporation, or other facility or institution who causes to be rendered or who renders health care or professional services as a hospital, health care facility, physician, physician assistant, registered nurse, licensed practical nurse, nurse-midwife, licensed direct-entry midwife, dentist,

---

94, 96–97. The prelitigation panel requirement was not a part of the 1976 Act but has been in place since 1985. *See* Prelitigation Panel Requirement for Medical Malpractice Claims, ch. 238, S.B. 153, 1985 Utah Laws 652.

　[11] The Act defines "[m]alpractice action against a health care provider" and "[h]ealth care" the same now as in the original 1976 Act. *Cf.* Utah Health Care Malpractice Act, § 3, 1976 Utah Laws at 91–93.

> dental hygienist, optometrist, clinical laboratory technologist, pharmacist, physical therapist, physical therapist assistant, podiatric physician, psychologist, chiropractic physician, naturopathic physician, osteopathic physician, osteopathic physician and surgeon, audiologist, speech-language pathologist, clinical social worker, certified social worker, social service worker, marriage and family counselor,[12] practitioner of obstetrics, licensed athletic trainer, or others rendering similar care and services relating to or arising out of the health needs of persons or groups of persons and officers, employees, or agents of any of the above acting in the course and scope of their employment.

*Id.* § 78B-3-403(12).[13] Stated differently, a "health care provider" is any of the individuals or entities specifically listed, as well as the unspecified "others rendering similar care and services relating to or arising out of the health needs of persons." *Id.* This further includes any "partnership, association, corporation, or other facility or institution" thereof, as well as their "officers, employees, or agents . . . acting in the course and scope of their employment." *Id.*

¶26 Puzzling these pieces together, to constitute a "malpractice action against a health care provider," a claimant's alleged injuries must:

---

[12] The Act defines "marriage and family therapist" as "a person licensed to practice as a marriage therapist or family therapist under Sections 58-60-305 and 58-60-405." Utah Code § 78B-3-403(18). Although subsection 18 uses the term "marriage and family *therapist*," while subsection 12 uses "marriage and family *counselor*," it is clear the Act uses those terms interchangeably. *See id.* § 78B-3-403(12), (18) (emphases added).

[13] The 1976 Act's definition of "health care provider" was largely the same as it is today, except that "health care facility" was not in the 1976 definition, nor were "licensed direct-entry midwife," "clinical social worker," "licensed athletic trainer," and "physical therapist assistant." *See* § 3, 1976 Utah Laws at 91–92. "Social service aide" was in the 1976 Act but has since been deleted. *Id.*

(1) "relat[e] to or aris[e] out of"

(2) "health care," i.e., "any act or treatment performed or furnished, or which should have been performed or furnished":

    (a) "for, to, or on behalf of a patient";

    (b) "during the patient's medical care, treatment, or confinement"; and

    (c) by a listed "health care provider" or others "rendering similar care and services," or their "officers, employees, or agents . . . acting in the course and scope of their employment."

*See id.* § 78B-3-403(10), (12), (17).

¶27 The Tenth Circuit's certified question asks us to assume Wingate is a "health care provider." *Scott II*, 792 F. App'x at 591. Therefore, the fate of Jacob's claim hinges on the meaning of the terms "health care" and "relating to or arising out of."

    *A. Broadly Stated, "Health Care" Consists of Acts a "Health Care Provider" Furnishes to a Patient During the Patient's Treatment*

¶28 Jacob argues, and Wingate agrees, that not every act a "health care provider" performs is "health care" within the Malpractice Act's meaning. We agree.

¶29 The statute cabins what can be considered health care in the definition. "Health care" constitutes "any act or treatment performed or furnished . . . by any health care provider *for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement*." UTAH CODE § 78B-3-403(10). Thus, actions a health care provider takes are not "health care" if they are not "for, to, or on behalf of a patient" or if they do not occur "during the patient's medical care, treatment, or confinement." *Id.*

¶30 Likewise, the definition of "malpractice action against a health care provider" indicates that the Malpractice Act does not apply to *every* act a health care provider might perform. That definition requires not only that the defendant be a "health care provider," but also that the alleged injuries "relat[e] to or aris[e] out of health care rendered . . . by the health care provider." *Id.* § 78B-3-403(17). As Jacob rightly notes, this presupposes that health care providers will engage in some activities that qualify as "health care" and some activities that do not.

¶31 This reading comports with our prior interpretation of the Malpractice Act. For example, in *Smith v. Four Corners Mental Health Center, Inc.*, the defendant allegedly provided both "mental health

services," which the parties agreed constituted "health care," and foster care supervision services, which the court impliedly assumed did not qualify as "health care." *See* 2003 UT 23, ¶¶ 29–31, 70 P.3d 904. Although it was undisputed that the defendant provided at least some health care, our analysis did not stop there. Rather, to determine whether the Act applied, we examined whether the injuries and breaches of duties the plaintiff alleged "mostly" "related to or arose out of" the defendant's provision of mental health services or its non-health care foster services. *See id.* ¶¶ 31, 35–36.

¶32 A year after *Four Corners*, we examined the Malpractice Act in *Dowling v. Bullen* and expressly rejected the notion that the Act applies to "any" and "every" act a health care provider performs. 2004 UT 50, ¶ 11, 94 P.3d 915. In *Dowling*, we emphasized that "health care" is expressly limited to "only those services rendered by a health care provider 'for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement.'" *Id.* ¶ 10 (emphasis omitted) (quoting the Act's definition of "health care"). We also hypothesized that theft of a patient's wallet by a physician, while the patient was in the physician's office for an examination, would not constitute "health care," nor would the patient's tort claim for conversion "relat[e] to or aris[e] out of" health care under the Act. *See id.* ¶ 11. Simply stated, the Act does not apply to *every* action a health care provider may take.

¶33 Although Jacob and Wingate agree that not every act of a "health care provider" is "health care," they diverge on where to draw the line. Wingate posits that any act qualifies as "health care" so long as it "has something more than a tangential relationship to" or is done "*in furtherance*" of the patient's medical care, treatment, or confinement. (Emphasis added.)

¶34 Jacob, on the other hand, asserts that an act or treatment is not "health care" unless it "require[s] the exercise of medical judgment or expertise," or is performed by persons with "medical licenses," or is a type of act or treatment performed by other health care providers listed in the Malpractice Act. In other words, Wingate offers a broad interpretation of *what acts* can be considered "health care," while Jacob advocates for a narrower interpretation of "health care," largely limited by *who* performs the acts.

¶35 Both Wingate's and Jacob's suggested interpretations suffer from the same defect: they break faith with the statute's text. The legislature defined "health care" as

> any act or treatment performed or furnished, or which
> should have been performed or furnished, by any

13

> health care provider for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement.

UTAH CODE § 78B-3-403(10). Thus, by its plain language, "health care" includes those acts or treatments which were or should have been "performed or furnished": (1) by a "health care provider"; (2) "*for, to, or on behalf of* a patient"; and (3) "*during* the patient's medical care, treatment, or confinement." *Id.* § 78B-3-403(10) (emphases added).

¶36 Wingate's suggestion that "health care" applies to any act "in furtherance of" the patient's care ignores the statute's requirements that an act or treatment be done "during" the patient's care and be "for, to, or on behalf of" a patient. Determining whether an act was done "for, to, or on behalf of a patient during the patient's medical care [or] treatment" requires examining the scope of the care or treatment that the health care provider prescribed, ordered, or designed for the patient. It also requires examining whether the act from which the injury arose occurred *during* that treatment or care—that is, whether that act occurred "in the course of" the treatment. *See During*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/during (last updated June 20, 2021). Wingate's invitation to interpret "health care" as applying to any act "in furtherance of" the patient's care would take away the limitations that "during" injects into the statute. And it would rewrite the Malpractice Act in a way that broadens the text's reach. We therefore decline to adopt Wingate's interpretation.

¶37 Accepting Jacob's arguments would likewise require us to add language to the Act. Jacob's position that "health care" includes only those acts that "require the exercise of medical judgment or expertise" or are performed by persons with a "medical license" ignores and narrows the Malpractice Act's plain language defining "health care" and "health care provider."

¶38 Under the Malpractice Act, "health care provider" includes "any person, partnership, association, corporation, or other facility or institution who . . . renders health care or professional services as" any of the expressly listed providers. UTAH CODE § 78B-3-403(12). It also captures "others rendering similar care and services," as well as their "officers, employees, or agents . . . acting in the course and scope of their employment." *Id.* In other words, if a person is an employee or agent of a listed health care provider, or of an unlisted provider "rendering similar care and services," or of a provider's association or corporation, then that employee or agent falls under

the Act's definition of "health care provider" while she is "acting in the course and scope of [her] employment" and rendering "health care," i.e., performing an act "for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement." *See id.* § 78B-3-403(10), (12). The Act's plain language does not require that the agent/employee health care provider have specific medical expertise nor does it require a medical license. And, in fact, it contemplates that some may not.[14]

¶39 Further, although the Malpractice Act uses the word "medical" when defining "health care" as an act or treatment "during the patient's *medical* care, treatment, or confinement," *id.* § 78B-3-403(10) (emphasis added), the Act repeatedly uses the terms "medical" and "health" interchangeably.[15] When read in the context of the Act as a whole—including the flexible definition of "health care provider" that encompasses many actors who are not specifically "medical" providers, as well as those rendering "similar

---

[14] While the Act requires one type of listed "health care provider" to have a medical license—physicians—the Act also includes a long list of individuals who qualify as "health care providers" without having *medical* licenses, though they may need other types of licenses. *See* UTAH CODE § 78B-3-403. And, again, "health care provider" also includes *employees or agents* of listed and "other" health care providers who are acting in the scope of employment, and the Act does not expressly require those employees or agents to have specific licenses. *See id.* § 78B-3-403(12).

[15] For example, the Act's purpose section is concerned with the cost of "health care," "medical malpractice insurance," "health-related malpractice insurance," and "professional liability insurance." UTAH CODE § 78B-3-402. These terms have been included since the Act was adopted in 1976. *See* § 2, 1976 Utah Laws at 91. Similarly, the Act's statute of limitations and notice requirements apply to any "malpractice action against a health care provider," *see* UTAH CODE § 78B-3-404; *id.* § 78B-3-412, while the prelitigation "medical review panel" hearing requirements apply to "medical liability cases against health care providers." *Id.* § 78B-3-416. The 1985 amendment adding the prelitigation panel requirements used the term "medical malpractice" case or action, even though it referred to the section of the Act in which "[m]alpractice action against a health care provider" is used. *See* § 1, 1985 Utah Laws at 653.

care and services relating to or arising out of the *health* needs of persons," *id.* § 78B-3-403(12) (emphasis added)—it is evident that the legislature intended a broader meaning. *See generally Barneck v. Utah Dep't of Transp.*, 2015 UT 50, ¶¶ 41–44, 353 P.3d 140 (holding that two different phrases could mean the same thing where they were "not obviously 'materially different'" from one another and where the context in which the different phrases were used in the statute indicated they mean the same thing).

¶40 In short, the statute's plain language does not require the "exercise of medical judgment or expertise."[16] This does not mean that "health care" under Utah's Malpractice Act never requires professional expertise or judgment. It only means the Act requires what the statutory language says when read in context. And neither "health care" nor "health care provider" invariably require specialized medical expertise or a "medical license" in the narrow sense Jacob contends.

¶41 Jacob also attempts to whittle down the definition of "health care" by arguing that an act or treatment cannot constitute "health care" under the Malpractice Act unless it is "of a type performed or furnished by the health care providers listed in the Act." Jacob supports this theory by selectively weaving certain clauses from the definitions of "health care" and "health care provider" together with the Malpractice Act's prelitigation medical review panel requirements. Specifically, Jacob highlights that the Act requires "health care" to be performed by a "health care provider," UTAH CODE § 78B-3-403(10), and "health care provider" includes a list of specific types of providers, plus "others rendering similar care and services relating to or arising out of the health needs of persons." *Id.* § 78B-3-403(12). Jacob then highlights that the Act requires potential claimants to undergo a prelitigation review by a panel whose members include a "health care provider[] . . . practicing and knowledgeable in the same specialty as the proposed defendant." *Id.*

---

[16] Jacob supports his interpretation with other states' cases. But they are not helpful because of the differences between Utah's statute and the statutes of other states. For example, Indiana's definition of "malpractice" uses the phrase "based on" health care rather than the more expansive phrase "relating to or arising out of health care," which Utah's Malpractice Act uses. *Compare B.R. ex rel. Todd v. State*, 1 N.E.3d 708, 713 (Ind. Ct. App. 2013), *with* UTAH CODE § 78B-3-403(17).

§ 78B-3-416(4)(b)(i). Threading these provisions together, Jacob concludes that an act or treatment—even if ordered or performed by a "health care provider" the Act lists, such as a marriage and family counselor—cannot constitute "health care" if it differs from acts or treatments performed by other health care providers. We disagree with Jacob's conclusion for a few reasons.

¶42   First, in the definition of "health care provider," the phrase "rendering similar care and services" modifies only the unspecified "other[]" providers, not the listed providers. *Id.* § 78B-3-403(12). Therefore, a listed "health care provider," such as a "marriage and family counselor," need not perform care and services similar to other health care providers in order for that person to be considered a "health care provider" or for their services to constitute "health care" under the Act. So long as an expressly listed "health care provider" performs an act or treatment "for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement," then that act or treatment is "health care" under the Malpractice Act. *Id.* § 78B-3-403(10).

¶43   Second, even if the actor is not a listed health care provider but instead falls into the unspecified "others" category, that person must only render care "similar" to, not the *same as*, listed providers, to be considered a "health care provider" and for their actions to be considered "health care." *See id.* § 78B-3-403(12), (10). We laid out this interpretation in *Platts v. Parents Helping Parents*, where we held that "the statute . . . means what it says. All those identified in the statute are 'health care providers.' All others rendering care and services similar to those so explicitly identified are also 'health care providers.'" 947 P.2d 658, 663 (Utah 1997).

¶44 Third, while the Malpractice Act requires prelitigation review by a panel that includes a member in the "same specialty" as the defendant, it does not require a panelist to be in same *sub*-specialty. *See* UTAH CODE § 78B-3-416(4)(b)(i). The statute's definition of "health care provider" includes a long list of generalized specialties (e.g., "registered nurse," "physician"), as well as some sub-specialties (e.g., "practitioner of obstetrics"). *See id.* § 78B-3-403(12). The fact that a health care provider practices within an unlisted sub-specialty of a listed general specialty does not mean that person is not a "health care provider" or does not provide "health care." For example, a physician practicing dermatology is unquestionably a "physician" and thus a "health care provider" under the Act, even though the statute lists only "physicians," not dermatologists, as health care providers. Likewise, a "marriage and family counselor" practicing counseling or therapy focused on

wilderness experiences is still a "marriage and family therapist" and a "health care provider" under the Act. *See id.*

¶45 Jacob's argument resembles the argument we rejected in *Platts*—that an entity qualifies as a health care provider only if their services are "so similar to those listed as to leave no reasonable doubt as to their status." *See Platts*, 947 P.2d at 660–63 (citation omitted). We repeat what we said in *Platts*, the statute "means what it says." *Id.* at 663. Persons and entities expressly listed in the statute are "health care providers," as are all "others" rendering care and services "similar" to—even if not precisely the same as—that of expressly listed providers. *See id.* And so long as a person or entity who qualifies as a "health care provider" performs or should have performed an "act or treatment" "for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement," then that act, treatment, or omission qualifies as "health care" under the Malpractice Act. UTAH CODE § 78B-3-403(10).

¶46 The final tool Jacob uses to prop up his narrow interpretation of "health care" is a 2002 discussion from the floor of the Utah Senate. In 2002, the Utah Senate debated, but did not adopt, an amendment to the Act that would have expressly narrowed the Act's application. In Jacob's words, the amendment would have made the Act apply "only to claims of professional malpractice and not to claims of ordinary negligence." Jacob explains that this particular amendment was not adopted after some senators "explained their understanding that the Act already applied only to claims of professional malpractice" and not to a "slip-and-fall or a non-malpractice issue."

¶47 Jacob contends this 2002 debate supports his theory that the Act and its definition of "health care" were intended only to apply where the treatment or care at issue involves "the exercise of professional medical judgment." We find this discussion far less helpful than Jacob does for multiple reasons.

¶48 First, what a handful of individual legislators thought the Act meant is not powerful interpretive evidence. This is especially true when the debate occurred twenty-six years after the 1976 enactment of the language we are interpreting.

¶49 Second, it is hard to derive meaning from a decision *not* to expressly narrow the Act's scope. That could mean that some senators thought that the Act already had—and should continue to have—narrow applicability. It could also mean that some senators thought that the Act did and should apply more *broadly*. And, of

course, we are just hearing from a handful of members of only one of the bodies necessary to enact legislation.

¶50 Further, and perhaps more importantly, when we find the plain language of the statute is clear, we need not reach for legislative history to aid our understanding. *See Wilson v. Valley Mental Health*, 969 P.2d 416, 418 (Utah 1998) ("When examining a statute, we look first to its plain language as the best indicator of the legislature's intent and purpose in passing the statute. Only if that language is ambiguous do we then turn to a consideration of legislative history and relevant policy considerations."); *State v. Bess*, 2019 UT 70, ¶ 25, 473 P.3d 157 ("We do not look to other interpretive tools unless we conclude that the statute is ambiguous."). Suffice it to say, Jacob's legislative history argument does not persuade us to adopt his narrow interpretation of "health care."

¶51 Based on the plain language of the statute, we conclude that "health care" constitutes acts or treatments which were or should have been "performed or furnished": (1) "by any health care provider"; (2) "*for, to, or on behalf of* a patient"; and (3) "*during* the patient's medical care, treatment, or confinement." UTAH CODE § 78B-3-403(10) (emphases added).

### B. *"Relating to or Arising Out of" Requires More than a Tangential Relationship But Does Not Require Proximate Causation*

¶52 To answer the question that the Tenth Circuit asked, we also need to decide what the Act means when it requires that a plaintiff's alleged injuries "relat[e] to or aris[e] out of" health care. *See* UTAH CODE § 78B-3-403(17).

¶53 Jacob's briefing focuses almost entirely on the scope of "health care" and not the phrase "relating to or arising out of." But Jacob appears to argue that the latter phrase means the claim or injury must be more than "tangentially related to" health care. *See Dowling*, 2004 UT 50, ¶ 11. Wingate argues for a "proximate cause" requirement but asserts that the health care need only be "*a*" proximate cause, not the "sole" cause, to come within the Act's grip. We conclude that "relating to or arising out of" casts a wider net than "proximate cause" but is not so wide as to catch claims and injuries that are only tangentially related to the provision of health care. And we find additional limits on the application of the Act by reading "relating to or arising out of" in context.

¶54 We agree with Jacob that the Act does not apply when a health care professional's "alleged transgressions are only tangentially related to their provision of health care services." *See Dowling*, 2004 UT 50, ¶ 11. The defendant in *Dowling*, a marriage

counselor who qualified under the Malpractice Act as a "health care provider," provided marriage counseling (health care) to the plaintiff, as well as separately to the plaintiff's then-husband. *Id.* ¶ 2. After the marriage counselor and the plaintiff's husband proceeded to have a sexual relationship, the plaintiff sued the marriage counselor for alienation of affection. *Id.* ¶¶ 3–5. The marriage counselor invoked the Act as a defense, arguing the claims arose out of her provision of health care. *Id.* ¶ 5.

¶55 The *Dowling* court concluded the plaintiff's alleged injuries related to or arose out of the defendant's provision of health care to the *husband*, not treatment rendered by the defendant to the *plaintiff*, and therefore the Act did not apply. *Id.* ¶ 13. The court held that the plaintiff must be the "complaining patient" because the Act's definition of "health care" applies to treatment rendered during "*the patient's* medical care, treatment, or confinement," and the plaintiff's injuries must "relat[e] to or aris[e] from" that care in order to constitute a "malpractice action against a health care provider." *See id.* ¶¶ 10–13 (citations omitted). Further, even though the Act repeatedly uses the word "any" in the definitions of "health care," "health care provider," and "malpractice action against a health care provider," and even though the latter also uses the phrase "relating to or arising out of," the court rejected the defendant's overbroad interpretation of the Act's applicability. *Id.* ¶ 11 (citations omitted). Instead, we held that the Act does not shield a health care professional whose "alleged transgressions are only tangentially related to their provision of health care services." *Id.*

¶56 We agree and reiterate that an injury does not "relat[e] to or aris[e] out of" health care where a health care provider's "alleged transgressions are only tangentially related to their provision of health care services." *Id.* But while *Dowling* describes one of the definition's boundaries, it does not capture the full meaning of the phrase "relating to or arising out of."

¶57 Wingate argues that we should interpret the phrase "relating to or arising out of health care" to equate to a proximate causation relationship between the provision of health care and the injury. Wingate supports its "proximate cause" theory by citing cases that interpret the then-undefined phrase, "arises out of, in connection with, or results from," found in the Utah Government Immunity Act

(UGIA).[17] We find the reasoning used in those cases does not transfer to the Malpractice Act's use of the phrase "relating to or arising out of."

¶58 The most relevant UGIA case Wingate cites is *Barneck v. Utah Department of Transportation*, 2015 UT 50. In *Barneck*, this court interpreted "competing provisions" of the UGIA—one provision that waived governmental immunity for "any injury *caused by* . . . a defective, unsafe, or dangerous condition of any highway [or] . . . culvert," and another provision creating an exception to such waiver (i.e., reinstating immunity) where "the injury *arises out of, in connection with, or results from* . . . the management of flood waters" or the "repair, or operation of [a] flood or storm system[]." *Id.* ¶ 2 (alterations in original) (emphasis added) (quoting UTAH CODE § 63G–7–301 (2015)). We first held that the waiver of immunity for "any injury *caused by* . . . a defective, unsafe, or dangerous condition" requires an element of *reasonable foreseeability*, because we found the waiver sounded in premises liability in tort, which incorporates a reasonable foreseeability requirement. *See id.* ¶¶ 14–17 (emphasis added). We then held the phrase "arises out of, in connection with, or results from," which appears in the *exception* to the waiver, is properly interpreted in context to apply "only where a plaintiff's injury is *proximately caused* by" the type of conduct specified in the statute. *Id.* ¶¶ 39, 43–44 (emphasis added) (citation omitted).

¶59 To reach this conclusion, we reasoned that, "in the context of a statute aimed at waiving governmental immunity," it made "little sense" to interpret the *exception* to the waiver of immunity to be broader than the actual waiver. *Id.* ¶ 43.

¶60 Using similar logic as we used in *Barneck*, we reach the opposite conclusion here. The Malpractice Act is designed to "expedite early evaluation and settlement" of professional malpractice claims against health care providers by applying certain hurdles and statutes of limitations to health care malpractice actions. *See* UTAH CODE § 78B-3-402(3). Interpreting the reach of the Act too narrowly would threaten to undermine the protections the Act

---

[17] In 2017, subsequent to this court's 2015 decision in *Barneck v. Utah Department of Transportation*, 2015 UT 50, 353 P.3d. 140, the legislature defined this phrase in a way that differs from our interpretation in *Barneck*. *See* Governmental Immunity Amendments, H.B. 399, ch. 300, § 2, 2017 Utah Laws 1463 (codified at UTAH CODE § 63G-7-102(1)).

affords health care providers. And interpreting the phrase "relating to or arising out of" as equating to "proximate cause" would do exactly that—it would narrow the potential universe of circumstances where the Act might otherwise apply. It would make little sense to constrict the Act's reach in that way, given the Act's goal of expediting and facilitating settlement of claims against health care providers.

¶61 Further, the way the legislature designed the Malpractice Act also indicates that "relating to or arising out of" does not mean "proximate cause." An argument that the Malpractice Act applies is one inevitably made by the defendant, not the plaintiff, and one likely made on a motion to dismiss. Therefore, although a *plaintiff* will need to eventually prove that the defendant's act or omission proximately caused the alleged injury in order to succeed on the merits, it makes little sense to force the *defendant* to prove proximate causation to establish that the Act ensnares the claim.

¶62 Consider, for example, if the statute of limitations had not yet run, but the plaintiff had not complied with the Act's notice or prelitigation panel requirements. In such a case, the defendant would move to dismiss, arguing that the plaintiff had not complied with the Act. And if the court granted that dismissal, it might do so without prejudice—that is, the court might allow the plaintiff to refile her case after having complied with the notice and prelitigation panel requirements. If the defendant had to prove that her own acts or omissions proximately caused the plaintiff's alleged injuries in order to win the initial dismissal, the defendant will have essentially made part of the plaintiff's case for when the plaintiff comes back to court after following the Act's procedures. This kind of burden shifting makes little sense in this context.

¶63 Moreover, if the legislature wanted to adopt "proximate cause" as the standard, they knew how to use that phrase. The Malpractice Act uses the phrase "proximate cause" in multiple places and has done so since its 1976 enactment.[18] Yet, in the definition of

---

[18] The 1976 Act defines "[t]ort" as "any legal wrong, breach of duty, or negligent or unlawful act or omission *proximately causing* injury or damage to another." Utah Health Care Malpractice Act, ch. 23, H.B. 35, § 3(28), 1976 Utah Laws at 90, 93 (emphasis added) (currently codified at UTAH CODE § 78B-3-403(38)). The 1976 Act also included the phrase "proximate cause" when setting the requirement for recovery of damages in an action based on a health care

(continued . . .)

"[m]alpractice action against a health care provider," the legislature chose to use the phrase "relating to or arising out of," not "proximate cause." *See* UTAH CODE § 78B-3-403(17). Taken together, we conclude that this is ample textual evidence to reject Wingate's argument that the legislature meant "proximately caused" when it said "relating to or arising out of."

¶64 Once again, we find the Act's plain language instructive. There is no magic, nor hidden meaning, in the phrase "relating to or arising out of." "Arising" out of means to "originate from." *See Arise*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/ arise (last updated June 23, 2021). "Relating to" means to have a connection with. *See Relate To*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/relate%20to (last visited June 15, 2021). When read in context, it becomes evident that the terms "health care" and "health care provider" do the heavy lifting in defining when the Act applies.

### C. A "Malpractice Action Against a Health Care Provider" Requires That the Patient's Injuries "Relate to or Arise Out of" "Health Care" Rendered by a "Health Care Provider"

¶65    As discussed above, *see supra* ¶¶ 23–26, the Malpractice Act applies to any "malpractice action against a health care provider." *See e.g.*, UTAH CODE §§ 78B-3-404, -412. The Act defines "[m]alpractice action against a health care provider," *id.* § 78B-3-403(17), "[h]ealth care," *id.* § 78B-3-403(10), and "[h]ealth care provider." *Id.* § 78B-3-403(12). Reading these definitions together, the Act applies only if the injuries:

(1) "relat[e] to or aris[e] out of"
(2) "health care," i.e., "any act or treatment performed
or furnished, or which should have been performed or
furnished":

---

"provider's failure to obtain informed consent," requiring the plaintiff to prove that the "unauthorized part of the health care rendered was the *proximate cause* of personal injuries suffered by the patient." § 5(1)(g), 1976 Utah Laws at 95 (emphasis added) (currently codified at UTAH CODE § 78B-3-406(1)(b)(vii)). More recently, the legislature added the phrase "proximately" into yet another section of the Act. *See* UTAH CODE § 78B-3-426(3)(c) (requiring a "nonpatient plaintiff" to show their "injury was *proximately caused* by an act or omission of the health care provider" (emphasis added)).

(a) "for, to, or on behalf of a patient";
(b) "during the patient's medical care, treatment, or confinement"; and
(c) by a listed "health care provider" or others "rendering similar care and services," or their "officers, employees, or agents" who "render[] health care" while "acting in the course and scope of their employment."

*See id.* § 78B-3-403(10), (12), (17); *see also supra* ¶¶ 23–26.

¶66 If any one of the elements is not met, the Act does not apply. Determining whether there was "health care" requires examining: *who* performed (or should have performed) the acts in question; what was the *scope* of the care or treatment the health care provider prescribed, ordered, designed, or carried out for the patient; and whether a particular act occurred *during* that treatment or care for the patient—that is, whether the act explicitly or implicitly falls within the scope, and in the course of, the treatment or care prescribed, designed, or ordered for the patient. *See supra* ¶¶ 35–51.

¶67 Once we determine that "health care" was rendered (or should have been rendered) by a "health care provider," we then look to the relationship between that health care and the patient's injuries. The patient's injuries must "relat[e] to or aris[e] out of" the health care rendered by the health care provider. UTAH CODE § 78B-3-403(17). That is, the injury must originate from or be connected to something a health care provider did or should have done in the course of providing health care to that patient. *See supra* ¶ 64.

¶68 A useful way to conceptualize how these provisions and requirements fit together to fence in the Act's applicability is through hypotheticals which rise or fall on one or more of these statutory requirements.

¶69 For example, the *Dowling* court hypothesized that the Act would *not* apply to a patient's tort claim for conversion against their doctor who stole money from the patient's wallet during a medical examination. *See Dowling*, 2004 UT 50, ¶ 11. We agree. Even if the doctor is a "health care provider" and had provided "health care" during the patient's visit, the patient's loss of cash is not an injury that originated from the provision of health care. Theft cannot reasonably be said to be an act or treatment "for, to, or on behalf of" the patient, nor in the course of or "during the patient's medical care, treatment, or confinement." *See* UTAH CODE § 78B-3-403(10). Even using the broadest view of "medical care, treatment, or confinement," there is no conceivable medical or health purpose of

theft; nor is theft an omission of or a negligent version of an act that does have a medical or health purpose. Thus, the patient's loss of the wallet does not "relat[e] to or aris[e] out of heath care." *See id.* § 78B-3-403(17).

¶70 Jacob forwarded a number of hypotheticals in which he argues the Act should not apply.[19] For example, Jacob posits that if a plaintiff slipped and fell in a hospital hallway on a puddle of soda, it would be "absurd" to require that plaintiff to get a "cardiologist's opinion that [the] unaddressed soda spill in the hospital hallway caused the fall." Jacob's assertion misses the point—whether the Act applies depends on whether the precise situation and claims meet the definition of a "malpractice action against a health care provider," which requires examining whether the injuries "relat[e] to or aris[e] out of" "health care" performed by a "health care provider." *See* UTAH CODE § 78B-3-403(17); *see also supra* ¶¶ 35–51, 65–67. There is some overlap in these questions—act or treatment is not "health care" unless it was furnished by a "health care provider," *see id.* § 78B-3-403(10); and a person is not a "health care provider" unless they render "health care." *See id.* § 78B-3-403(12). But these questions must nevertheless be answered for the lawsuit to be a "malpractice action against a health care provider." And the answers may be highly fact-dependent.

---

[19] Although we find that the Act would not apply in some of the hypotheticals Jacob advances, we do so using a different rationale than Jacob does. Jacob argues it would be "absurd" to apply the Act to several hypotheticals because of the Act's requirement that plaintiffs must, before filing a health care malpractice action in district court, have their claims evaluated by a prelitigation medical review panel that includes a "licensed health care provider[]" who is "practicing and knowledgeable in the same specialty as the proposed defendant." UTAH CODE § 78B-3-416(4)(b)(i). In so arguing, Jacob alludes to the absurdity doctrine, which permits this court to read a statute contrary to its plain meaning when "the operation of the plain language" is "so overwhelmingly absurd that no rational legislator could have intended the statute to operate in such a manner." *Bagley v. Bagley,* 2016 UT 48, ¶ 28, 387 P.3d 1000 (citation omitted). We agree the Act doesn't apply to some versions of Jacob's hypothetical situations—not because it would be "absurd" to do so, but because his hypotheticals fail one or more of the statute's definitional requirements. *See supra* ¶ 65.

¶71 If the slip-and-fall claim Jacob envisions arises from a janitor's failure to remove the soda spill in the hallway, we would examine whether the failure to clean was "health care" and whether the janitor was a "health care provider." The cleaning or failure to clean is "health care" only if it was "for, to, or on behalf of [the] patient during the patient's medical care, treatment, or confinement" and done by a "health care provider." *See id.* § 78B-3-403(10). And because a janitor is not a listed "health care provider," we would examine whether the janitor was "render[ing] health care as" an "employee[] or agent[] of" a listed health care provider while "acting in the course and scope of [the janitor's] employment." *See id.* § 78B-3-403(12); *see also supra* ¶ 38.[20] The failure to clean the hallway is likely within the janitor's scope of employment with the hospital but would likely not have been "for, to, or on behalf of the patient during the patient's medical care, treatment, or confinement."

¶72 That is not to say that a hospital's custodial staff might never undertake an action that could be considered health care. If a janitor is tasked to do something "for, to, or on behalf of a patient during the patient's medical care" and those acts are "in the course and scope of [the custodian's] employment," the Act could apply. For example, if a cardiologist orders a frail post-operative patient to walk down a hallway assisted by a janitor as a part of physical rehabilitation, and if that janitor failed to protect the patient from a dangerous condition upon which the patient was injured, then the patient's claim in that case might be within the Act. Even if that staffer was not a listed health care provider or one of the "others rendering similar care and services," if that staffer was an "employee" or "agent" of such a provider, *and* "acting in the course and scope of their employment," *and* furnishing an "act or treatment . . . for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement" prescribed by the cardiologist, then that staffer was acting as a "health care provider," *see* UTAH CODE § 78B-3-403(12), and furnishing "health care." *See id.* § 78B-3-403(10); *see also supra* ¶¶ 25, 38. And the patient's claim for the staffer's negligent assistance would "relat[e] to or aris[e] out of health care" because the injury

---

[20] For the purpose of this hypothetical, we assume that the hospital where the injury occurs employs the janitor. A hospital is a listed health care provider under the Malpractice Act. *See* UTAH CODE § 78B-3-403(12).

originated out of the provision of that care. *See* UTAH CODE § 78B-3-403(17).[21]

¶73 Similarly, we agree with Jacob that the Act would likely not apply if the plaintiff were injured in an ambulance because of a mechanical failure. Although we agree with Jacob's conclusion that it would be absurd to "obtain a paramedic's opinion that missing lug nuts caused the accident," that's not why the Act wouldn't apply. Rather, if the claim is that the patient's injury arose from a mechanic's negligent installation of the ambulance's lug nuts, the injury did not arise from "health care" rendered by a "health care provider." That's because the mechanic's general auto-mechanic maintenance work could not reasonably be considered "for, to, or on behalf of" that patient and within the course of or "during" that patient's "medical care, treatment, or confinement." *See* UTAH CODE § 78B-3-403(10); *see also supra* ¶ 36.

¶74 But if, on the other hand, the plaintiff alleged that a paramedic negligently chose a detour that delayed the patient's arrival at the hospital, and the plaintiff's injuries arose from that delay, the plaintiff's claims might very well "relate to or arise out of" health care. *Cf. Carter v. Milford Valley Mem'l Hosp.*, 2000 UT App 21, ¶¶ 4–6, 20–21, 996 P.2d 1076 (explaining that paramedics are more than "chauffeur[s]" and are called upon to render emergency care and make decisions to preserve the life of the patient during transportation).

¶75 In sum, we reiterate that the meaning of "malpractice action[s] against a health care provider" comes not from reading individual words or phrases in isolation, but in looking at "health care," "health care provider," and "relating to or arising out of" read together in the context in which the statute presents them.

---

[21] To Jacob's assertion that it would be "absurd" to have a cardiologist opine on a slip-and-fall case as part of the prelitigation review panel—a reasonable legislator could design a system where a health care provider familiar with the duties and safety protocols involved in post-operative physical rehab would sit on the prelitigation review panel and opine on the plaintiff's claim that a health provider breached the standard of care in maintaining a safe environment for post-operative rehabilitation.

## II. JACOB'S INJURIES "RELAT[E] TO OR ARIS[E] OUT OF HEALTH CARE RENDERED OR WHICH SHOULD HAVE BEEN RENDERED BY A HEALTH CARE PROVIDER"

¶76 The Tenth Circuit asked us to not only opine on the Act's meaning, but to analyze whether the Act applied to the claims Jacob raises. We conclude that (A) at least part of the wilderness therapy Wingate provided to Jacob was health care and (B) Jacob's injuries relate to or arise out of that health care.

### A. The Relevant Part of Jacob's "Wilderness Therapy" Excursion Was "Health Care"

¶77 Jacob argues that that the particular acts which resulted in his injuries—hiking and rock climbing—do not constitute "health care." Jacob contends that Wingate's program consists of "two separate components"—the "traditional counseling" component performed by Wingate's Therapist and the "wilderness experience" component performed by Wingate's field staff—and that only the former qualifies as "health care." Jacob reaches that conclusion by explaining that "[t]raditional counseling qualifies as health care because it is an act or treatment performed by social workers and marriage and family counselors, both of whom are among the health care providers listed in the Act." Jacob contends that "wilderness therapy is not 'health care'" in part because the field staff who provide the wilderness experiences do not have "medical licenses" and do not exercise "professional medical judgment." He further reasons that "[n]o provider listed in the Act furnishes back-country travel, wilderness living, adventure experiences, the application of primitive skills, or other similar services."

¶78 Wingate, on the other hand, argues that the "group hike during which [Jacob's] injury occurred . . . cannot be divorced from the treatment WinGate was providing." Wingate explains that hiking, camping, and "continuous interactions with the wilderness more generally[] are therapeutic by design and intention." Wingate further explains it was "implementing [Jacob's] treatment plan at the time of Jacob's injury" and was "performing or furnishing to Jacob the very type of activities [the Therapist] had identified as part of Jacob's eight-week therapeutic program: hiking and immersive wilderness experiences designed to provide increased confidence and develop problem solving and self-care skills."

¶79 We agree with Wingate that it was acting as a "health care provider" and providing "health care" when Jacob was hiking and rock climbing. Contrary to Jacob's assertion, the fact that Wingate's

field staff, and not the Therapist, directly supervised the hike does not change this conclusion.

¶80 Our path to this conclusion starts from the premise that Wingate's Therapist is a "health care provider" and provided counseling or mental health treatment that constituted "health care."[22] We examine the scope of the care or treatment Wingate's Therapist prescribed, ordered, or designed for Jacob; and we examine whether the acts giving rise to Jacob's injuries (hiking and rock climbing) fall within the scope of that treatment or care. *See supra* ¶¶ 36, 66–67. Or, to use the language of the Act, we examine whether hiking and rock climbing opportunities were furnished "for . . . or on behalf of" Jacob and "during [his] medical care, treatment, or confinement." *See* UTAH CODE § 78B-3-403(10).

¶81 Wingate's Therapist created a written "treatment plan" for Jacob that included not only "individual and group therapy," but also called for Jacob to be "immersed in wilderness principles and experiences," "learn outdoor survival skills," and "be introduced to new philosophies and strategies to assist him in creating a more effective path for himself and for his family relationships." *Scott v. Wingate Wilderness Therapy, LLC (Scott II)*, 792 F. App'x 590, 592 (10th Cir. 2019). The Therapist's affidavit also described Jacob's treatment plan as including "hiking (exercise)." *Id.* Thus, the scope of the treatment prescribed indicates that the group hike and the rock climbing during that hike were done "for . . . or on behalf of" Jacob,

---

[22] By way of reminder, the district court determined that Wingate is a "health care provider," and the Tenth Circuit has not asked us to review that determination. *See Scott v. Wingate Wilderness Therapy, LLC (Scott II)*, 792 F. App'x 590, 591, 594–95 (10th Cir. 2019). The district court based its determination on the fact Wingate employs "several licensed medical and mental health professionals," including a "licensed marriage and family therapist," who provide "behavioral or mental health services." *Scott v. Wingate Wilderness Therapy, LLC (Scott I)*, No. 4:18-CV-0002-DN, 2019 WL 1206901, at *3– 5 (D. Utah Mar. 14, 2019). We also note that a "marriage and family therapist" is an expressly listed "health care provider" under the Act. UTAH CODE § 78B-3-403(12), (18). Jacob concedes that the "traditional counseling" provided by Wingate's Therapist "does qualify as 'health care.'"

"during [his] medical care, treatment, or confinement" and therefore constitutes "health care." *See* UTAH CODE § 78B-3-403(10).[23]

¶82 We next examine who carried out the acts that gave rise to Jacob's injuries: Wingate's field staff. *See supra* ¶ 66. We reject Jacob's argument that the hike and wilderness therapy component of Wingate's program cannot be deemed "health care" because it was operated by Wingate's field staff who lack "medical licenses" and "exercised no professional medical judgment when they allowed Jacob to climb" the rock formation. As discussed above, the Act does not require a "health care provider" to exercise "medical judgment or expertise" or have a "medical license" in the way Jacob posits. *See supra* ¶¶ 37–40. Also as discussed above, "health care provider" includes any "association, corporation, or other facility or institution" that renders health care or professional services as any of the listed providers or "others rendering similar care." UTAH CODE § 78B-3-403(12). "Health care provider" also includes the "officers, employees, or agents of any of the above acting in the course and scope of their employment." *Id.* Therefore, in this case, Wingate's field staff qualify as "health care providers" under the Act because Wingate employs a "marriage and family therapist"—a listed "health care provider" under the Act—and because Wingate's field staff acted within the "course and scope of their employment" when carrying out the treatment plan the Therapist created. *See supra* ¶ 38.

¶83 We also reject Jacob's contention that "wilderness therapy" cannot be considered "health care" because "[n]o [health care] provider listed in the Act furnishes back-country travel, wilderness living, adventure experiences, the application of primitive skills, or

---

[23] An astute observer might note that Jacob's injury took place while climbing a rock formation, and "climbing" was not listed in Jacob's treatment plan—neither in the written plan nor the Therapist's subsequent affidavit. *See Scott II*, 792 F. App'x at 592. In response we would note that the treatment plan included not only hiking (and thus encompassed the ordinary or planned part of the group hike), it also included the broader goals of "immers[ion] in wilderness principles and experiences," and "learn[ing] outdoor survival skills," *id.*, which could implicitly encompass climbing. We pass no judgment on the merits of such a broad treatment plan. And we note that a challenge to the creation of such a broad treatment plan would, if brought in the form of a lawsuit, constitute a challenge to the provision of health care and thus would need to comply with the Act.

other similar services." First, as discussed above, each individual sub-specialty or sub-type of service need not be listed in the Act to fall within the bounds of "health care provider" and "health care." *See supra* ¶¶ 41–45. A "marriage and family counselor" practicing counseling or therapy that is focused on wilderness experiences is still a "marriage and family therapist" and a listed "health care provider" under the Act, even though their practice may be sub-specialized. *See supra* ¶¶ 41–45. And again, so long as that health care provider—or their agents or employees acting within the scope of employment—performed an act or omission "for, to, or on behalf of" Jacob, "during [his] medical care, treatment, or confinement," the Malpractice Act deems that to be "health care." *See* UTAH CODE § 78B-3-403(10), (12); *see also supra* ¶ 38.

¶84 Further, Jacob provides no support for the proposition that "[n]o provider listed in the Act furnishes" wilderness therapy. The fact that "outdoor youth programs" such as Wingate are licensed under a detailed set of state regulations to provide therapy in the wilderness, and those rules require employment of specific clinical and therapeutic personnel including, but not limited, to a "licensed marriage and family counselor," militates against Jacob's proposition. *See* UTAH ADMIN. CODE r. 501-8-1–23; *see also* UTAH CODE § 62A-2-101(33) (2014); *id.* § 62A-2-101(33) (2021).

¶85 To the extent Jacob believes it is improper for Wingate's Therapist to use "wilderness therapy" and a broad set of "wilderness experiences" as a health treatment tool, or to the extent Jacob believes it was improper for the Therapist to delegate implementation of that care to field staff, such arguments squarely challenge the Therapist's professional judgment and thus sound in malpractice. We acknowledge that Jacob describes his claims as not based on the Therapist's recommendation to hike or experience wilderness activities, and instead as "based on Wingate's field staff members' decision to allow him and others to detour from a designated hiking route to climb a dangerous rock formation unattended and without assistance." In other words, Jacob doesn't challenge the treatment that was prescribed, but the way that treatment was carried out or implemented. But that distinction doesn't let his claims escape the Act's grip. Improper implementation of a health care treatment is still "health care," because the Act defines "health care" to include not only affirmative acts, but also those acts or treatments that "should have been performed or furnished." UTAH CODE § 78B-3-403(10).

### B. *Jacob's Claim "Relat[es] to or Aris[es] Out of" the Treatment Prescribed and Rendered by Wingate*

¶86 Sticking with his theory that only the traditional counseling part of Wingate's services constitute "health care," Jacob argues that the Therapist's "counseling was not the proximate cause of his injury" and, therefore, his rock climbing injury does not "relat[e] to or aris[e] out of health care." Jacob reasons that the persons directly responsible for his injuries are Wingate's field staff—who Jacob contends are not "health care providers"—and those field staff broke the causal chain with the Therapist. Wingate, on the other hand, contends that its provision of "health care"—i.e., all of Jacob's wilderness experiences— is "a proximate cause" of Jacob's injuries as alleged, and therefore the injuries "relat[e] to or aris[e] out of health care."

¶87 Jacob claims Wingate breached its duty of care to him by

> (i) allowing the youth to take a detour from the designated route [of the group hike]; (ii) allowing the lead staff member to leave the group with only one staff member remaining with the group; (iii) not doing anything to determine whether the climbing of the rock formation would be safe for the youth; (iv) not properly assessing the danger of allowing the youth to climb the rock formation; (v) allowing the youth to climb the dangerous rock formation without supervision; (vi) allow[ing] the youth to climb the dangerous rock formation without any safety gear; (vii) not assisting Jacob with his descent down the rock formation[;] and (viii) instructing [Jacob] to climb down the rock formation when and where it was dangerous to do so.

*Scott II*, 792 F. App'x at 592–93 (last three alterations in original) (quoting *Scott v. Wingate Wilderness Therapy, LLC* (*Scott I*), No. 4:18-CV-0002-DN, 2019 WL 1206901, at *2 (D. Utah Mar. 14, 2019)).

¶88 In other words, Jacob claims that Wingate negligently implemented and negligently supervised the group hike—which was part of Jacob's treatment plan—by allowing Jacob to participate in an unplanned and unsafe rock climbing activity, which ultimately resulted in Jacob's knee injury. These all "relat[e] to" and "aris[e] out of" Wingate's provision of mental health care because they occurred during Jacob's treatment. That is, the climbing injury arises or originates from Wingate's staff's implementation of the wilderness therapy treatment plan the Therapist created for Jacob—a treatment plan that called for Jacob to hike and have wilderness experiences.

¶89 That Wingate's staff may have *negligently* implemented Jacob's treatment does not mean that negligent treatment escapes the Act's grip. This is precisely what the Act ensnares. A "malpractice action against a health care provider" applies to tort claims against any health care provider for "injuries relating to or arising out of health care rendered *or which should have been* rendered by the health care provider." UTAH CODE § 78B-3-403(17) (emphasis added). Likewise, "health care" applies not only to affirmative acts or treatments, but also to those "*which should have been* performed or furnished." *Id.* § 78B-3-403(10) (emphasis added).

¶90 Jacob's suggestion that the Act does not apply because Wingate failed to protect him from unsafe conditions is reminiscent of arguments made by the plaintiff in *Smith v. Four Corners Mental Health Center, Inc.*—arguments we rejected. *See* 2003 UT 23, 70 P.3d 904. In *Four Corners*, the plaintiff argued that, during the defendant's provision of foster care services (which were not considered health care), the defendant "negligently supervised" the plaintiff and another foster child, who harmed the plaintiff, and that this negligent foster care supervision was the cause of the plaintiff's injuries, not the defendant's provision of mental health services (which was undisputedly health care). *See id.* ¶¶ 31–32. We disagreed, concluding the plaintiff's "allegations all arise out of [the defendant's] provision of mental health services" because the complaint alleged the defendant knew or should have known of the third party assailant's "violent character" and "fail[ed] to supervise the preparation and implementation of [the plaintiff's] treatment plan." *Id.* ¶ 35.

¶91 Similarly, here, Jacob essentially alleges that Wingate failed to properly supervise the implementation of his mental health treatment plan. Jacob's treatment plan broadly included "immers[ion] in wilderness principles," "learn[ing] outdoor survival skills," and hiking so that he will be "introduced to new philosophies and strategies to assist him in creating a more effective path for himself and for his family relationships." *Scott II*, 792 F. App'x at 592. In other words, Jacob's treatment plan included not only traditional notions of mental health counseling, but also testing physical skills in the wilderness. Taking this treatment plan and its purported therapeutic value on its face, we conclude that Jacob's rock climbing injuries reasonably "relat[e] to or aris[e] out" the health care Wingate was providing.

¶92 Jacob pushes back against this conclusion, arguing that it yields absurd results. Jacob contends that because "the only licensed health care provider to interact with Jacob during his time at Wingate

was . . . a licensed marriage and family counselor," it would be "absurd" to apply the Act's prelitigation panel review requirement because that would "requir[e] Jacob to have obtained a marriage and family counselor's opinion that the rock formation was unsafe to climb."

¶93 Jacob's argument seems to be premised on a notion that another marriage and family counselor, or another mental health provider, would and could not be versed in wilderness therapy and the proper implementation thereof. This is one of the rationales Jacob supplies for his assertion that wilderness therapy is not "health care," because "no provider listed in the Act furnishes" wilderness therapy. As we highlighted when we rejected this argument the first time around, *see supra* ¶¶ 83–84, "outdoor youth programs" such as Wingate are licensed under a detailed set of state regulations to provide therapy in the wilderness, and are required by those rules to employ specific clinical and therapeutic personnel including, but not limited, to a "licensed marriage and family counselor." *See* UTAH ADMIN. CODE r. 501-8-1–23; *see also* UTAH CODE § 62A-2-101(33). It would not be absurd for the legislature to believe that there are other therapists or counselors practicing in wilderness therapy who could sit on the prelitigation panel to opine on the safe implementation of such therapy, including the extent to which Wingate's staffer should have protected Jacob from unsafe conditions during therapeutic activities.

## CONCLUSION

¶94 An injury sustained while climbing a rock formation during a "wilderness therapy" excursion operated by the defendant "relat[es] to or aris[es] out of health care rendered . . . by a health care provider" within the meaning of the Act, where the defendant is or employs a health care provider who prescribed hiking, wilderness experiences, and learning outdoor survival skills as part of the plaintiff's therapeutic treatment plan, that plan was carried out by the defendant's staff, and the plaintiff's injuries occurred during the plan's execution. Such is the case here and the Act applies to Jacob's claims.

———————