**2022 UT App 70**

# THE UTAH COURT OF APPEALS

JASON SHELL,
Appellant,

*v.*

INTERMOUNTAIN HEALTH SERVICES INC., JUNIOR ETE, AND
DOUGLAS ALKIRE,
Appellees.

Opinion
No. 20200915-CA
Filed June 9, 2022

Third District Court, West Jordan Department
The Honorable William K. Kendall
No. 200902403

Andrew G. Deiss, Corey D. Riley, Sydney J. Sell, and
John Robinson Jr., Attorneys for Appellant

David J. Jordan and Mark E. Hindley,
Attorneys for Appellees

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and RYAN D. TENNEY concurred.

ORME, Judge:

¶1     Jason Shell challenges the district court's dismissal of his
claims without prejudice against Intermountain Health Services,
Inc. (IHC, as it is referred to in the briefs), Junior Ete, and Douglas
Alkire (collectively, Appellees) on the ground that he did not
comply with the pre-litigation requirements of the Utah Health
Care Malpractice Act (the Act). Shell primarily argues that
because he received no medical treatment from IHC, the Act did
not cover his claims. We agree and reverse.

BACKGROUND[1]

¶2     In March 2019, in the throes of a mental health crisis, Shell sought medical attention at IHC's Behavioral Health Access Center at LDS Hospital in Salt Lake City (the Access Center). Shell's girlfriend accompanied him and waited with him in the lobby, but an employee "told her to leave because the treatment would take several hours." A staff member then escorted Shell to an examination room and instructed him to remove his clothes down to his underwear and change into a hospital gown. After he changed, the staff placed his clothes, along with his other belongings, in a locker down the hall. A social worker then "advised that he must take a sedative to 'get some rest.'" Shell was uncomfortable with this and asked whether he could receive "an alternative treatment." The social worker replied "that he could either take the sedative or leave the Access Center."

¶3     Still uncomfortable with taking the sedative, Shell opted to leave and asked to use a phone to call his girlfriend to come pick him up. Shell was then taken to the lobby to use the phone, but he was unable to reach his girlfriend, so the social worker escorted Shell back to the examination room. At that time, Douglas Alkire, who was employed by IHC as a security guard at the Access Center, "walked over to the only public exit at the Access Center and locked the door," meaning it could be opened only by a staff key card. While standing in the doorway of the exam room, Shell and the social worker "were having a peaceful conversation to

---

1. "On appeal from a motion to dismiss, we review the facts only as they are alleged in the complaint. We accept the factual allegations as true and draw all reasonable inferences from those facts in a light most favorable to the plaintiff. We recite the facts accordingly." *Peck v. State*, 2008 UT 39, ¶ 2, 191 P.3d 4 (quotation simplified).

resolve the situation," but the social worker and other IHC staff still "refused to provide treatment unless Shell took a sedative."

¶4     At this point, Shell informed the staff that he wanted to leave but could not do so on his own, and he again requested to call his girlfriend. The staff refused. As Shell was talking to the social worker, Junior Ete, another IHC security guard, entered the Access Center via a key card. Ete quickly approached and came "face-to-face with Shell, bumping him with his chest, and blocking Shell from leaving." Alkire and other staff then "surrounded" Shell. Shell took a few steps out of the exam room into the hallway, but "[g]iven the increasing hostility" coming from the staff, "Shell backed up slowly, taking a couple of steps away from Ete to create some distance."

¶5     As Shell continued to back away, Ete "quickly grabbed Shell by his shoulders, dragged Shell across the lobby [and] slammed Shell against the wall." Ete "then forced Shell to the ground with his hands around Shell's neck" and, with help from Alkire, kept Shell, who was mostly disrobed at this point, pinned down. "Shell shouted for help" while other "IHC employees watched."

¶6     Ete and Alkire then lifted Shell up and slammed him back into the ground. This caused Shell to start bleeding from his mouth and from the back of his head. Ete subsequently "moved his forearm down to Shell's neck and forced his body weight on Shell's throat for 20 seconds," making Shell "unable to call for help . . . because he couldn't breathe."

¶7     Ete and Alkire then dragged Shell out of the Access Center, causing his hospital gown to come off completely. Ete and Alkire, assisted by other IHC staff, then proceeded, for approximately 15 minutes, to pin Shell to the floor outside the Access Center before deciding to call the police. Still bleeding, Shell remained pinned to the ground until the police arrived, nearly losing consciousness at several points. While waiting for the police to arrive, the IHC

staff "wiped [the] blood away" after "discuss[ing] how it would appear to the police when they arrived."[2]

¶8    A year later, Shell filed a complaint, later amended, asserting seven causes of action: battery (against Appellees); assault (against Ete and IHC); false imprisonment (against Appellees); intentional infliction of emotional distress (against Appellees); negligent infliction of emotional distress (against Appellees); negligent hiring, supervision, and/or retention (against IHC); and breach of fiduciary duty (against IHC). Shell also sought declaratory relief from the district court that the Act did not apply because Appellees' actions were "outside the scope" of the Act.[3]

¶9    In response, pursuant to rule 12(b)(6) of the Utah Rules of Civil Procedure, Appellees filed a motion to dismiss for failure to state a claim upon which relief could be granted. They asserted that Shell's claims met all the triggering mechanisms of the Act, requiring him to follow the Act's pre-litigation requirements before filing a claim in district court.[4] Specifically, Appellees contended that "[t]his case is a medical malpractice case" "against a health care provider" and that the torts

---

2. The complaint contains no allegations regarding what happened after the police arrived.

3. The Act requires that certain procedural steps be taken before a lawsuit can be filed against a health care provider. These steps include the filing of notice of intent to commence an action and the filing of a complaint within two years. *See* Utah Code Ann. §§ 78B-3-404, -412 (LexisNexis 2018).

4. For the Act to apply, the claim must be a "malpractice action against a health care provider" arising out of or in relation to health care received. *Scott v. Wingate Wilderness Therapy, LLC*, 2021 UT 28, ¶ 23, 493 P.3d 592 (quotation simplified).

allegedly committed arose "during the course of [Shell's] visit for medical attention." Thus, Appellees argued, Shell's "[c]omplaint should be dismissed until he complies with the Act's requirements."

¶10   Shell opposed the motion, arguing that he did not have to comply with the Act's requirements because the triggering mechanisms for its application were not met. Specifically, he asserted that Ete and Alkire could not be considered health care providers under the Act and that the alleged torts were unrelated to any health care he received.

¶11   The district court granted Appellees' motion to dismiss. It ruled that Ete and Alkire were health care providers under the Act because they were the "employees or agents of [IHC] acting in the course and scope of their employment." It also ruled that the alleged torts "relate[d] to, and arose from, [Shell's] health care treatment." Thus, it ruled that Shell was required to comply with the Act's pre-litigation requirements and dismissed his claim without prejudice, allowing Shell to refile his complaint after he complied with the Act's requirements. Shell appeals.

ISSUE AND STANDARD OF REVIEW

¶12   Shell asserts that the district court erred in granting Appellees' motion to dismiss. "We review the grant of a motion to dismiss for correctness, granting no deference to the decision of the district court." *Hudgens v. Prosper, Inc.*, 2010 UT 68, ¶ 14, 243 P.3d 1275. "Also, we review the interpretation and application of a statute for correctness, granting no deference to the district court's legal conclusions." *Berneau v. Martino*, 2009 UT 87, ¶ 9, 223 P.3d 1128.

ANALYSIS

¶13 Shell contends that the district court erred in granting Appellees' motion to dismiss on the rationale that the Act applied to his case because his claims related to or arose from his health care treatment and because Ete and Alkire were health care providers under the Act. These issues are questions "of statutory interpretation, and so we march down the well-trod path we take when we hope to understand the meaning of statutory language." *Scott v. Wingate Wilderness Therapy, LLC*, 2021 UT 28, ¶ 21, 493 P.3d 592. We first look to the statute's plain language, assisted by "its linguistic, structural, and statutory context," *Olsen v. Eagle Mountain City*, 2011 UT 10, ¶ 9, 248 P.3d 465, and "we seek guidance from the legislative history and relevant policy considerations" only if "we find ambiguity in the statute's plain language," *Nelson v. Salt Lake County*, 905 P.2d 872, 875 (Utah 1995) (quotation simplified).

¶14 The Act applies to any "malpractice action against a health care provider." *Scott*, 2021 UT 28, ¶ 23 (quotation simplified). The Act defines this as

> any action against a health care provider, whether in contract, tort, breach of warranty, wrongful death, or otherwise, based upon alleged personal injuries relating to or arising out of *health care* rendered or which should have been rendered by the health care provider.

Utah Code Ann. § 78B-3-403(17) (LexisNexis 2018) (emphasis added).[5] "In other words, the Act applies when a plaintiff files suit

---

5. When these events occurred, the definitions of "health care" and "malpractice action" were located in Utah Code subsections 78B-3-403(10) and 78B-3-403(17), respectively. These subsections have since been renumbered as 78B-3-403(11) and 78B-3-403(18).

(continued…)

against a 'health care provider,' and the alleged injuries 'relat[e] to or aris[e] out of health care rendered . . . by the health care provider.'" *Scott*, 2021 UT 28, ¶ 23 (quoting Utah Code Ann. § 78B-3-403(17)) (alterations in original).

¶15     "Health care" is defined as

> any act or treatment performed or furnished, or which should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement.

Utah Code Ann. § 78B-3-403(10). "Breaking that down, 'health care' is: an 'act or treatment' that was or should have been 'performed or furnished': (1) 'for, to, or on behalf of a patient'; (2) 'during the patient's medical care, treatment, or confinement'; and (3) by a 'health care provider.'"[6] *Scott*, 2021 UT 28, ¶ 24 (quoting Utah Code Ann. § 78B-3-403(10)).

¶16     Additionally, it is important to note "that not every act a 'health care provider' performs is 'health care' within the Malpractice Act's meaning." *Id.* ¶ 28. "The statute cabins what can be considered health care" by stating that it "constitutes 'any act

_____

*Compare* Utah Code Ann. § 78B-3-403(10), (17) (LexisNexis 2018), *with id.* § 78B-3-403(11), (18) (Supp. 2022). These amendments make no change relevant to our analysis, and we cite the version in effect at the time of the events at issue in this matter.

6. The Act also defines who qualifies as a health care provider. But given our resolution of the case on the ground that Shell never received health care and therefore did not have to comply with the Act's pre-litigation requirements on that basis alone, we need not consider this definition and the case law interpreting it to determine whether Ete and Alkire fell under the Act's definition of a health care provider.

or treatment performed or furnished . . . by any health care provider *for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement.*'" *Id.* ¶ 29 (quoting Utah Code Ann. § 78B-3-403(10)) (alteration and emphasis in original). Thus, determining whether an action by a health care provider

> was done "for, to, or on behalf of a patient during the patient's medical care [or] treatment" requires examining the scope of the care or treatment that the health care provider prescribed, ordered, or designed for the patient. It also requires examining whether the act from which the injury arose occurred *during* that treatment or care—that is, whether that act occurred "in the course of" the treatment.

*Id.* ¶ 36 (alteration and emphasis in original) (quotation simplified).

¶17 Here we assume, for purposes of our analysis, that Ete and Alkire were health care providers under the Act along with IHC. Thus, the questions before us are (1) whether Shell's injuries were the result of actions by Appellees "for, to, or on behalf of [Shell]" and (2) whether the actions occurred "during [Shell's] medical care, treatment, or confinement."[7] *See* Utah Code Ann.

---

7. The inquiry into whether a plaintiff's claims "relat[e] to or aris[e] out of health care rendered," *see* Utah Code Ann. § 78B-3-403(17) (LexisNexis 2018), is separate and apart from the inquiry into the other elements, *see Scott v. Wingate Wilderness Therapy, LLC*, 2021 UT 28, ¶¶ 52–64, 493 P.3d 592. We would undertake this further inquiry only if we first determined that health care was rendered, and because we conclude that no health care was provided to Shell in this case, we have no need to determine whether Shell's claims related to or arose out of any

(continued…)

§ 78B-3-403(10). In other words, we must determine whether the allegations of Shell's complaint mean that Appellees rendered health care to him.

¶18    Shell contends that the Act does not cover his claims because IHC "did not provide [him] health care." Given the allegations of his complaint, which we accept as true, *see supra* note 1, we agree.

¶19    The district court ruled that because Shell "went to IHC's mental health clinic at LDS Hospital to receive treatment for a 'mental health crisis,'" Shell's subsequent injuries at the hands of Ete and Alkire were covered by the Act because his injuries were a result of "health care treatment" provided to him. In essence, the court concluded that because Shell *sought* treatment at the Access Center and because he was harmed by the center's security guards, his injuries arose from treatment. This reasoning is flawed. According to his complaint, Shell never actually received "health care" after he arrived at the Access Center. The court simply assumed he received health care because he sought treatment. But accepting the facts alleged in the complaint as true, it is clear that Shell never received health care as it is defined in the Act.

¶20    Shell alleged that he arrived at the Access Center seeking help with a mental health crisis. He was then taken to an examination room and instructed to remove his clothing and change into a hospital gown. A social worker then "advised" Shell to take a sedative. Shell refused the sedative and was told that if he did not take it, he would have to leave the Access Center. Shell informed the social worker that, given this condition for

---

health care provided. *See id.* ¶ 67 (noting that "once we determine that 'health care' was rendered," we then proceed to determine whether the "patient's injuries . . . relate[d] to or ar[o]se out of the health care rendered") (quotation simplified).

treatment, he would like to leave. After an unsuccessful attempt to contact his girlfriend for a ride home, Shell discussed the situation with the social worker in the doorway of the examination room, but the social worker still "refused to provide treatment unless Shell took a sedative." It was at this point that the violence ensued and Shell sustained his injuries.

¶21    In summary, Shell sought treatment but when Shell refused the treatment offered by the social worker, and the social worker refused to provide an alternative treatment as Shell requested, no medical care ensued. There was therefore no "treatment" by the Access Center's employees "for, to, or on behalf of [Shell]." *See* Utah Code Ann. § 78B-3-403(10). As a consequence, Ete and Alkire's actions in assaulting and pinning Shell to the ground in a violent manner could likewise not be considered health care. *See Scott v. Wingate Wilderness Therapy, LLC*, 2021 UT 28, ¶ 29, 493 P.3d 592 ("Actions a health care provider takes are not health care if they are not for, to, or on behalf of a patient.") (quotation simplified).

¶22    Additionally, Shell's injuries could not have occurred "*during* [Shell's] medical care, treatment, or confinement," *see* Utah Code Ann. § 78B-3-403(10) (emphasis added), because he did not undergo treatment at any point, given the impasse on the sedation requirement and given that he had not been confined or admitted to the Access Center when Ete and Alkire confronted and eventually injured him. In fact, the social worker and Shell were looking for a way to contact Shell's girlfriend so that he could leave the Access Center. And when the two security guards approached, Shell was standing in the doorway of the examination room talking with the social worker and was still refusing to take the sedative, and the social worker was still refusing to treat Shell given his refusal. Thus, the injuries Shell sustained were not "during . . . medical care, treatment, or confinement." *See id.*

¶23  Appellees resist this conclusion, arguing that "Shell sought medical treatment from the Access Center" and that "[t]he injuries he sustained were directly related to and arose from the health care he sought at the Access Center." We disagree. Appellees' argument does not comport with the plain language of the Act. The Act specifically directs that for a plaintiff's claims to fall under the Act's purview, the plaintiff's injuries must have arisen from actions taken "for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement." *Id.* Thus, merely *seeking* treatment is not enough; there must be something done, or something that should have been done, by a provider, specifically on the patient's behalf. *See Scott*, 2021 UT 28, ¶ 36 ("Determining whether an act was done 'for, to, or on behalf of a patient during the patient's medical care [or] treatment' requires examining the scope of the care or treatment that the health care provider prescribed, ordered, or designed for the patient. It also requires examining whether the act from which the injury arose occurred *during* that treatment or care—that is, whether that act occurred 'in the course of' the treatment.") (alteration and emphasis in original) (quotation simplified). Accordingly, Shell's act of seeking medical care does not equate to health care under the Act because nothing was done for Shell on his behalf by IHC's staff. On the contrary, IHC declined to provide the care Shell sought because Shell would not agree to be sedated first.

CONCLUSION

¶24  Because Shell did not receive health care as defined in the Act, Shell was not required to comply with the Act's pre-litigation requirements in bringing claims against Appellees. The district court erred in concluding otherwise. We reverse the dismissal of Shell's complaint and remand for such further proceedings as may now be in order.

————————