*This opinion is subject to revision before final publication in the Pacific Reporter*

**2024 UT 31**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

JANE DOE H.P., *et al.*,*
*Appellants,*

*v.*

DAVID H. BROADBENT, M.D., *et al.*,*
*Appellees.*

No. 20220917
Heard October 20, 2023
Filed August 8, 2024

On Direct Appeal

Fourth District, Provo
The Honorable Robert C. Lunnen
No. 220400226

Attorneys*:

Terence L. Rooney, Jefferson W. Gross, J. Adam Sorenson,
Salt Lake City, for appellants

Troy L. Booher, Caroline A. Olsen, Taylor P. Webb,
David J. Jordan, Jordan C. Bledsoe, Salt Lake City, for appellee
Intermountain Healthcare

---

*   Additional Appellants: Jane Does P.H., C.H., B.K., B.B., S.M., R.U., H.M., K.H., E.B., A.S., M.T., A.G., S.B., K.S., M.P., S.P., B.H., A.W., S.O., M.Z., M.R., C.G., T.M., M.M., K.W., J.S., C.S., C.C., M.C., K.A., S.A., R.D., D.B., J.C., L.W., C.W., S.L., E.M., A.F., A.M., A.A., B.W., W.D., M.I., L.B., S.E., D.M., J.B., K.C., J.A., I.A., C.Y., R.P., G.A., S.S., R.B., R.A., J.D., D.F., M.A., T.L., T.A., T.G., A.T., S.I., K.B., L.C., J.T., R.C., A.I., A.D., H.Z., E.N., L.H., C.M., N.A., H.G., F.A., R.M., A.B., S.C., A.J., A.E., S.N., M.E., A.L., T.S., C.L., S.U., C.T., C.I., T.H., L.S., and Jane Does 1–100.

Additional Appellees: Intermountain Healthcare, Inc. dba Utah Valley Hospital; HCA Healthcare, Inc. dba MountainStar Healthcare, a Delaware corporation; and Does 1–50.

Additional Attorneys: Christian W. Nelson, Brandon B. Hobbs, Kristina H. Ruedas, Aaron T. Cunningham, Karra J. Porter, Rebecca L. Hill, Anna P. Christiansen, Salt Lake City, for appellee David H. Broadbent, M.D.; Tawni J. Anderson, Eric P. Schoonveld, Tucker F. Levis, Salt Lake City, for appellee HCA Healthcare Inc. dba MountainStar Healthcare. Annika B. Barkdull, Washington, D.C., for *amicus curiae* Independent Women's Law Center, in support of appellants.

---

JUSTICE PETERSEN authored the opinion of the Court, in which ASSOCIATE CHIEF JUSTICE PEARCE, JUDGE CHRISTIANSEN FORSTER, JUDGE ORME, and JUDGE TENNEY joined.

Having recused themselves, CHIEF JUSTICE DURRANT, JUSTICE HAGEN, and JUSTICE POHLMAN do not participate herein; COURT OF APPEALS JUDGE MICHELE M. CHRISTIANSEN FORSTER, JUDGE GREGORY K. ORME, and JUDGE RYAN D. TENNEY sat.

---

JUSTICE PETERSEN, opinion of the Court:

## INTRODUCTION

¶1    Ninety-four former patients of David Broadbent, an obstetrician and gynecologist (OB-GYN), have sued him, alleging that Broadbent sexually assaulted them under the guise of providing medical treatment. Their claims against Broadbent include sexual battery, sexual assault, and intentional infliction of emotional distress.

¶2    Broadbent and the other Defendants in this case moved to dismiss the Plaintiffs' claims in the district court. They argued that the Plaintiffs had essentially alleged a medical malpractice action but had failed to comply with the prelitigation requirements of the Utah Health Care Malpractice Act (the Malpractice Act or Act). The district court agreed and dismissed the case.

¶3    The Plaintiffs have appealed that decision to us. They argue that their claims are not subject to the Malpractice Act, so they were not required to comply with its prelitigation requirements.

¶4    We agree with the Plaintiffs that their claims are not covered by the Malpractice Act. The Act applies to any "malpractice action against a health care provider." UTAH CODE § 78B-3-404(1). It defines a malpractice action as "any action against

a health care provider . . . based upon alleged personal injuries relating to or arising out of *health care* rendered . . . by the health care provider." *Id.* § 78B-3-403(18) (emphasis added). Here, the Plaintiffs do not allege they were injured by any health care that Broadbent may have provided them. Rather, they allege that he abused his position as their doctor to sexually assault them under the pretense of providing health care. The point of their claims is that his actions were not really health care at all. And the fact that Broadbent committed the alleged sexual assaults during medical appointments or examinations does not bring that conduct within the Malpractice Act's definition of health care because the Plaintiffs allege Broadbent's abusive conduct had no medical purpose and was outside the scope of any legitimate health care he provided them.

¶5    Accordingly, we conclude that the Malpractice Act does not apply to the Plaintiffs' claims because they have not brought an action "based upon alleged personal injuries relating to or arising out of health care rendered" by Broadbent. We therefore reverse the district court's dismissal of the Complaint.

## BACKGROUND[1]

¶6    For more than four decades, David Broadbent worked as an OB-GYN in Provo, Utah. He saw patients in his own office on University Avenue or at Utah Valley Hospital (which is run by Defendant Intermountain Healthcare) or Timpanogos Regional Hospital (which is run by Defendant MountainStar Healthcare).

¶7    Ninety-four of Broadbent's former patients filed this lawsuit, alleging that he sexually assaulted them under the guise of providing obstetric or gynecological treatment. In the Complaint, each Plaintiff relates her experience with Broadbent and alleges that she was subjected to acts of sexual abuse. Because of the number of Plaintiffs, we recite the allegations of a selection of them as representative examples.

---

[1]    "[O]ur recitation of the facts underlying [the] Plaintiffs' lawsuit is based on the allegations in their Complaint. Because this appeal involves [the] Defendants' motion to dismiss [the] Plaintiffs' claims, we must assume all the factual allegations in the Complaint are true and determine whether the claims fail as a matter of law." *League of Women Voters of Utah v. Utah State Legislature,* 2024 UT 21, ¶ 14, __ P.3d __. *See also Peck v. State,* 2008 UT 39, ¶ 2, 191 P.3d 4.

¶8 B.K. was referred to Broadbent after having a miscarriage. When she arrived at her appointment, Broadbent discussed the miscarriage with her "rather crudely," and then asked if she had ever had a pap smear. When she responded in the negative, he told her, "We can do a pap smear today." She told him no, that she would "rather schedule another appointment" for that. But Broadbent insisted, "We're going to do one today." He gave her a sheet and told her to undress from the waist down. B.K. did as he asked because she thought, "he is a doctor, someone who should be trusted and has the expertise to recognize if there is something wrong." Broadbent began the exam and inserted a speculum in B.K.'s vagina — and she then realized he had also put a finger in her rectum. When he finished, she began to cry. He then announced that he was going to do a breast exam. He "put his hands under her sweatshirt, palmed both of her breasts, squeezed them once, and was done." B.K. left feeling "frustrated, angry, upset, . . . overwhelmed[,] . . . awful, gross, and violated."

¶9 H.P. went to Broadbent to be checked for a sexually transmitted illness. Broadbent joked that the swab would be painful and that he would need to swab her until he counted to one hundred. H.P. thought Broadbent was joking, but he held the swab in her vagina and moved it around slowly as he counted to one hundred.

¶10 P.H. visited Broadbent to get a prescription for birth control before her wedding. Upon learning that P.H. had not had sex before, Broadbent said, "your fiancé is pretty lucky to get to have sex with a girl like you." Broadbent told her she would not need a pap smear because she was only nineteen and not sexually active, but then said he would "just take a look and make sure everything was good" before prescribing her birth control. He warned her that sex hurts the first time because a man's penis is equivalent to three to four fingers in width. He told her she was unprepared for what she would experience. Then, without warning, he said, "Watch this," and stuck three fingers into P.H.'s vagina. She tensed up and tried not to cry. Broadbent asked, "How's that feel?" P.H. said it was uncomfortable. And he advised her to "work on stretching herself in a warm bath."

¶11 R.P. was a patient of Broadbent's for eight years and had three children during that time. She saw Broadbent for her first gynecological appointment at the age of nineteen. At this appointment, he performed a pelvic exam, during which he "suddenly put his fingers in her rectum without any warning." He

then "took his gloves off, lifted up her shirt and underwire bra, and started feeling her breasts." She alleges that over the years, Broadbent "frequently performed" similar "pelvic exams." During the exams, he would make comments such as "you like that" or "all the girls like this part" as she "squirmed on the table in pain." After each appointment, R.P. would go to her car crying and try to forget about the experience. She felt "terrible," but assumed "it was all routine and that the fact that she left in so much pain and with feelings of being violated meant there was something wrong with her."

¶12   C.G. went to Broadbent because she was having painful cramping during her periods. He had her undress so he could perform a physical exam. During the "exam," he "grabbed [her] breasts and . . . continually squeez[ed] them," and told her he needed to make sure her "nipples could get hard." "He rubbed, squeezed, and played with them until they got hard." Then, with his ungloved hand, he "insert[ed] his index finger into her vagina, his middle finger in her rectum, and pushed them deep enough to rest his thumb on her clitoris, . . . . then began moving them in a circular motion which caused excruciating pain." After the appointment, she was "extremely uncomfortable" and said she "never wanted to go back." But as it was her first appointment with a doctor other than her pediatrician, "she did not know what to expect or what was normal."

¶13  S.O. went to Utah Valley Hospital to give birth. Her regular OB-GYN was unavailable, and Broadbent delivered her baby because he was the on-call doctor at the time. After the delivery, Broadbent went to S.O.'s recovery room. She alleges that,

> [W]hile talking about something related to the actual delivery, Broadbent slid his hand down [her] hospital gown and pinched the nipple on her right breast. His hand did not linger and he did not feel around—it was literally a hard, painful pinch, followed immediately by removing his hand. During the entire incident, Broadbent continued speaking and did not break eye contact with [her]; in fact, he continued discussing the delivery as though he had not done anything.

She was "shocked and embarrassed and was left feeling unsure and telling herself that she had to be misunderstanding the situation."

¶14  T.S. saw Broadbent twice for prenatal appointments. At both appointments, Broadbent felt her breasts with one hand and thrust his fingers in her vagina and rectum with the other hand, as he hit his body against the exam table with each thrust.

¶15  L.C. went to Broadbent during her first pregnancy. At one appointment, "Broadbent started feeling [her] breasts in a way which felt like he was feeling her up rather than examining her." This seemed odd to L.C. because "it was not her normal yearly gynecological check-up." But she did not object because "she was unaware of what normal protocol was." As she attended prenatal appointments over the next six months, Broadbent "insisted on vaginal exams using his fingers and breast checks at almost every appointment." L.C. switched to a different OB-GYN who only delivered at American Fork Hospital because she was "so scared" that Broadbent might end up delivering her baby as the on-call doctor at Utah Valley Hospital.

¶16  Many of the Plaintiffs describe similar experiences with Broadbent. They initially sought gynecological or obstetric care from Broadbent directly or encountered him during a pregnancy-related hospitalization at one of the facilities where he worked. They allege that at some point during their appointments, Broadbent sexually assaulted them under the pretense of providing a medical examination or treatment. Many of the Plaintiffs describe feeling "distraught," "terrible," and "violated." But they second-guessed their feelings because they trusted Broadbent's expertise as a doctor and assumed his conduct must have been routine medical care.

¶17  The Plaintiffs explain that,

> It was not until December 2021 when one of Broadbent's victims related her experience on a podcast, causing numerous other accounts of women being sexually abused by Broadbent to surface, that Plaintiffs realized that they were not alone, and Broadbent's actions were not medically necessary — they were unlawful. With this revelation and media on this issue, numerous other women came forward and started sharing their stories of being abused by Broadbent.

¶18  The Plaintiffs collectively sued Broadbent, Intermountain Healthcare, and MountainStar Healthcare, asserting seven causes of action: sexual battery, sexual assault, negligent supervision,

fraudulent misrepresentation, joint venture, intentional infliction of emotional distress, and negligent infliction of emotional distress. The Complaint alleges that Broadbent committed acts of sexual assault under the guise of providing medical treatment, causing each woman to suffer trauma, pain, anxiety, and distress.

¶19 In response, the Defendants moved to dismiss the Complaint for lack of subject matter jurisdiction. They asserted that the Plaintiffs' claims fall within the ambit of the Utah Health Care Malpractice Act, and therefore the Plaintiffs were required to comply with the Act's prelitigation requirements. Because the Plaintiffs had not done so, the Defendants argued that the district court lacked jurisdiction over the matter.

¶20 The district court granted the motion to dismiss, concluding that the Plaintiffs had alleged injuries that arose from health care rendered by Broadbent—thus implicating the Malpractice Act—and that they had failed to comply with the Act's prelitigation requirements.

¶21 The Plaintiffs appeal that decision. We exercise jurisdiction under Utah Code subsection 78A-3-102(3)(j).

## STANDARD OF REVIEW

¶22 "A district court's dismissal of claims [for lack of subject matter jurisdiction] . . . presents a question of law that we review for correctness." *Granite Sch. Dist. v. Young*, 2023 UT 21, ¶ 15, 537 P.3d 225 (cleaned up). "Also, we review the interpretation and application of a statute for correctness, granting no deference to the district court's legal conclusions." *Berneau v. Martino*, 2009 UT 87, ¶ 9, 223 P.3d 1128.

## ANALYSIS

¶23 The question before us is whether the Plaintiffs have alleged claims that are encompassed by the Utah Health Care Malpractice Act. *See* UTAH CODE §§ 78B-3-401 to -454. If they have, then the district court was correct to dismiss the Complaint because it is undisputed that the Plaintiffs did not comply with the Act's prelitigation requirements.

¶24 The Plaintiffs argue that the Malpractice Act does not apply here because the injuries they allege did not relate to or arise from health care. Rather, they assert that although Broadbent may have provided them with some actual medical treatment, their injuries occurred when he stopped providing health care and began sexually assaulting them for his own sexual gratification.

¶25 The Defendants contend that because the Plaintiffs' alleged injuries originated from something Broadbent did during otherwise medically indicated treatment, the Act's broad scope includes the Plaintiffs' allegations. And they argue that the Plaintiffs cannot evade the Malpractice Act's requirements by putting a different label on their claims.

¶26 We discuss the scope of the Act, with particular focus on its definition of "health care." And we conclude the conduct that the Plaintiffs allege injured them does not fall within that definition. Even though Broadbent's alleged actions took place during medical appointments or examinations, and even assuming he provided some legitimate medical treatment at the time, this does not transform his alleged acts of sexual assault into health care, nor does it turn the Plaintiffs' lawsuit into a malpractice action.

## I. THE MALPRACTICE ACT APPLIES TO ANY ACTION AGAINST A HEALTH CARE PROVIDER FOR PERSONAL INJURIES RELATING TO OR ARISING OUT OF HEALTH CARE RENDERED BY THE PROVIDER

¶27 Whether the Plaintiffs have brought a "malpractice action against a health care provider" within the parameters of the Malpractice Act is a question of statutory interpretation. *See Scott v. Wingate Wilderness Therapy, LLC*, 2021 UT 28, ¶¶ 19–21, 493 P.3d 592. We first look to the statute's plain language, including "its linguistic, structural, and statutory context." *Olsen v. Eagle Mountain City*, 2011 UT 10, ¶ 9, 248 P.3d 465.

¶28 Before would-be plaintiffs can bring a "malpractice action against a health care provider" in Utah, the Malpractice Act requires that they take certain procedural steps. *See* UTAH CODE §§ 78B-3-404 to -423 (2022);[2] *Scott*, 2021 UT 28, ¶ 22. Plaintiffs must

---

[2]   The legislature amended certain procedural components of the Utah Health Care Malpractice Act in 2022, 2023, and 2024. *See, e.g.*, H.B. 318, 64th Leg., 2022 Gen. Sess. (Utah 2022) (amending Utah Code section 78B-3-412); H.B. 201, 65th Leg., 2023 Gen. Sess. (Utah 2023) (amending Utah Code section 78B-3-416). But we cite and apply the version of the statute in effect at the time the Plaintiffs filed this action in February 2022. *See State v. Clark*, 2011 UT 23, ¶ 14, 251 P.3d 829 (noting that "[w]hen it comes to the parties' *procedural* . . . responsibilities, . . . . [t]he law governing [the]

(continued . . .)

first give the provider ninety days' prior notice of intent to commence the action, UTAH CODE § 78B-3-412(1)(a), and present their case to a prelitigation panel, *id.* § 78B-3-416(2)(a), which determines whether the claims have "merit" or "no merit," *id.* § 78B-3-418(2)(a)(i). Plaintiffs must also file their complaint within the Act's time limits. *Id.* § 78B-3-404.

¶29 The Act defines a "malpractice action against a health care provider" as "any action against a health care provider, whether in contract, tort, breach of warranty, wrongful death, or otherwise, based upon alleged personal injuries relating to or arising out of health care rendered or which should have been rendered by the health care provider." *Id.* § 78B-3-403(17) (2021).[3]

¶30 Of significance to this case, the Act defines "health care" as "any act or treatment performed or furnished, or which should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement." *Id.* § 78B-3-403(10).[4]

---

procedural occurrence is . . . the law in effect at the time of the procedural act").

[3] The Plaintiffs have alleged injuries that occurred between 1979 and 2021, and the definitions of "health care" and "malpractice action" have remained the same from the time the Act was originally passed in 1976 until the time the events at issue occurred. *See* Utah Health Care Malpractice Act, ch. 23, H.B. 35, § 3, 1976 Utah Laws at 91–93. While the definitions were originally located in Utah Code subsections 78B-3-403(10) and 78B-3-403(17), respectively, the subsections were renumbered in May 2022 as 78B-3-403(11) and 78B-3-403(18). *See* H.B. 318, 64th Leg., 2022 Gen. Sess. (Utah 2022). These amendments make no change relevant to our analysis, and we cite the version in effect at the time of the most recent event at issue, which is 2021. *See Clark*, 2011 UT 23, ¶ 13 ("[I]f a law regulates a . . . tort, we apply the law as it exists when the alleged . . . tort occurs—i.e., the law that exists at the time of the event giving rise to a cause of action.").

[4] In May 2023, the Legislature amended the Malpractice Act's definition of "health care" with a new provision that expressly excludes sexual acts:

(continued . . .)

¶31 As we explained in *Scott*, when read together, these provisions provide that,

> [T]o constitute a "malpractice action against a health care provider," a claimant's alleged injuries must:
>
> (1) "relat[e] to or aris[e] out of"
>
> (2) "health care," i.e., "any act or treatment performed or furnished, or which should have been performed or furnished":
>
>> (a) "for, to, or on behalf of a patient";
>>
>> (b) "during the patient's medical care, treatment, or confinement"; and

---

> (b) "Health care" does not include an act that, based on the totality of the circumstances, is sexual in nature regardless of whether:
>
>> (i) the act was committed under the auspice of providing professional diagnosis, counseling, or treatment; or
>>
>> (ii) at the time the act occurred, the victim believed the act was for medically or professionally appropriate diagnosis, counseling, or treatment.

Medical Malpractice Amendments, S.B. 247, 65th Leg., 2023 Gen. Sess. (Utah 2023) (codified at UTAH CODE § 78B-3-403(11)(b)), https://le.utah.gov/~2023/bills/static/SB0247.html [https://perma .cc/3UQ7-YS7D]. The general description of S.B. 247 states: "This bill clarifies what health care means in the context of a medical malpractice action." *Id.* The Defendants argue that this "change confirms that, before the amendment, the Act's definition of 'health care' had no such exclusion," and that by passing the amendment, "the Legislature effectively confirmed that the plaintiffs' allegations fell within the scope of the pre-amendment version of the Malpractice Act." The Plaintiffs argue that S.B. 247 was "merely a clarifying amendment" evidencing that the legislature took the initiative to clarify a misreading of the Act by some courts. We find it unnecessary, however, to speculate about the legislature's reasons for amending the definition of health care, because the language of the applicable version of the Act is clear.

> (c) by a listed "health care provider" or others "rendering similar care and services," or their "officers, employees, or agents . . . acting in the course and scope of their employment."

2021 UT 28, ¶ 26 (citing UTAH CODE § 78B-3-403(10), (12), (17)). "If any one of the elements is not met, the Act does not apply." *Id.* ¶ 66.

## II. THE PLAINTIFFS HAVE NOT ALLEGED CLAIMS FOR INJURIES RELATING TO OR ARISING OUT OF HEALTH CARE

¶32 Applying this analytical framework to the Plaintiffs' claims, some of the elements are not in dispute. Each Plaintiff alleges that she was a patient of Broadbent at some point. And the Plaintiffs do not dispute that Broadbent and the other Defendants are health care providers. So there is no question that the Plaintiffs have brought "an[] action against . . . health care provider[s]." UTAH CODE § 78B-3-403(17). And with respect to the definition of "health care," there is no dispute that the acts alleged to have caused the Plaintiffs' injuries were performed "by a listed health care provider," (element (2)(c) of the *Scott* framework), and that those acts were "for, to, or on behalf of a patient," (element (2)(a)).[5]

¶33 Thus, the core of the Plaintiffs' argument involves element (2)(b), in that they assert that the conduct that gave rise to their injuries did not take place "during" their "medical care [or] treatment." While the Plaintiffs acknowledge that Broadbent may have provided some of them with "some actual treatment," they emphasize that Broadbent's acts of sexual abuse had no medical purpose and therefore were not within the scope of the legitimate medical treatment Broadbent provided them.

¶34 The district court concluded otherwise. It ruled that the Plaintiffs' injuries related to or arose out of health care, and therefore their claims were subject to the Malpractice Act because Broadbent's "alleged misconduct" occurred "in the course of obstetrical treatment." The court reasoned this was so because Broadbent is an OB-GYN who was "purportedly performing OB-GYN services" during appointments addressing "obstetrical

---

[5] With respect to element (2)(a), the Plaintiffs do argue that Broadbent's actions were not "on their behalf." But because the Act's definition is broader than that and includes actions that are merely "to" a patient, we conclude that the Plaintiffs' argument primarily implicates element (2)(b).

issues"; the Plaintiffs "scheduled appointments to see Dr. Broadbent" or "were referred to [him] for the purpose of a medical examination"; they "sought medical advice and treatment related to obstetrics"; the conduct occurred "within the confines of a medical facility"; and Broadbent "us[ed] medical instruments[,] and examinations often occurred on an exam table."[6] In all, the court concluded that because "OB-GYNs commonly examine sensitive, otherwise private areas of a woman's person, including the pelvic area generally, the vaginal area, and breasts," the "alleged misconduct" occurred "in the course of obstetrical treatment."

¶35 The court acknowledged that "not all alleged improper acts performed during a medical exam must constitute medical malpractice." But it contrasted instances where a health care provider's misconduct was only tangentially related to the health care provided—like a podiatrist engaging in the kind of misconduct alleged in this case, or a physician stealing a patient's wallet during an appointment, *see Dowling v. Bullen*, 2004 UT 50, ¶ 11, 94 P.3d 915—with the circumstances alleged here. And the court concluded that because the actions alleged to have caused the Plaintiffs' injuries occurred "in the course of obstetrical treatment," it followed that the Plaintiffs had alleged injuries related to or arising from health care.

¶36 The Defendants' argument on appeal is similar. They contend that the Plaintiffs' injuries relate to or arise out of health care provided by Broadbent because "the prescribed scope of obstetrical and/or gynecological care . . . necessitated some touching of or communication about the patients' bodies," and it was "*during* that care" that the alleged misconduct occurred. They assert that the alleged misconduct was "inextricably intertwined with the provision of such care." Accordingly, they argue that because the Plaintiffs allege injuries arising out of actions that were performed "during a medically indicated exam or treatment," the Act applies.

---

6    The district court also noted that during the motion to dismiss hearing, the Plaintiffs' counsel did not reject the possibility of using a standard of care expert. We discuss later why the Plaintiffs' use of a medical expert would not bring their claims within the purview of the Act. *See infra* ¶ 46 and note 7.

¶37   This analysis is incorrect in light of the facts alleged in the Complaint. To reiterate, the central dispute on appeal is whether the Plaintiffs' alleged injuries relate to or arise out of *health care* performed by Broadbent. In this case, the answer turns on element (2)(b) of the framework we provided in *Scott* for applying the Malpractice Act's definition of "health care"—namely, whether the conduct from which the injuries arose (the alleged sexual assault) occurred "*during* the patient's medical care, treatment, or confinement." UTAH CODE § 78B-3-403(10) (emphasis added).

¶38   To start, it is important to accurately identify the Plaintiffs' alleged injuries because the Act applies only where the "*injuries* relat[e] to or aris[e] out of *health care*." *Id.* § 78B-3-403(17) (emphases added). And we caution that Broadbent's alleged *acts* of sexual abuse should not be conflated with the Plaintiffs' *injuries*. Here, the Plaintiffs' alleged injuries include "pain, suffering, anxiety, distress"; "[self] doubt[] . . . [and] lost trust in [self] and in authority figures"; "hyper-vigilan[ce]"; "triggers that cause flashbacks"; "damage to . . . self-worth, . . . depression, social anxiety, denial, minimization . . . , suspicion of male intentions . . . [,] and shame"; "fe[eling] violated, distraught, and gross"; "emotional distress, humiliation, embarrassment, mental distress"; and "trauma."

¶39   Then, we must identify the actions that the Plaintiffs allege gave rise to these injuries. We assume, for purposes of this appeal, that the Plaintiffs received some legitimate health care from Broadbent. However, the Complaint alleges that it was Broadbent's acts of sexual abuse that gave rise to the Plaintiffs' injuries. They describe many specific incidents, which they allege were not part of their medical treatment, had no medical purpose, and were solely for Broadbent's own sexual gratification. For example, S.O. does not complain of any actions Broadbent took when delivering her baby. Rather, she asserts that her injuries arose when he visited her recovery room after the delivery and, without acknowledgment or explanation, put his hand down her shirt and pinched her nipple. C.G. alleges that her injuries arose when she went to Broadbent because she was having painful menstrual cramps, and among other things, he "grabbed [her] breasts and . . . continually squeez[ed] them," claiming he needed to make sure her "nipples could get hard." And P.H. alleges that her injuries arose when she visited Broadbent to get a birth control prescription, and he personally demonstrated how painful sex would be by suddenly sticking three fingers in her vagina while exclaiming, "Watch this." The other Plaintiffs make allegations of the same nature.

¶40 The question here is whether these particular actions constitute "health care" under the Malpractice Act. And the answer turns on whether the acts were performed "during the patient's medical care, treatment, or confinement." *Id.* § 78B-3-403(10); *Scott v. Wingate Wilderness Therapy, LLC*, 2021 UT 28, ¶ 26, 493 P.3d 592 (listing "during" as element (2)(b) of a "malpractice action"). To make this determination, we examine:

> what was the *scope* of the care or treatment the health care provider prescribed, ordered, designed, or carried out for the patient; and whether a particular act occurred *during* that treatment or care for the patient—that is, whether the act explicitly or implicitly falls within the scope, and in the course of, the treatment or care prescribed, designed, or ordered for the patient.

*Scott*, 2021 UT 28, ¶ 66.

¶41 The Defendants answer this question in the affirmative because the Plaintiffs "uniformly allege that [Broadbent] engaged in misconduct during an exam or treatment, which he could undertake only because he also was performing medically indicated acts." For example, Broadbent was able to insert his ungloved fingers into C.G.'s vagina and rectum, "push[ing] them deep enough to rest his thumb on her clitoris," only because he was already performing a physical exam to address painful cramping during her periods. In this way, they emphasize the timing of the misconduct.

¶42 But we have made clear that "during" means more than that the acts took place at the time of a medical appointment or exam. *Id.* ¶ 28 ("[N]ot every act a 'health care provider' performs is 'health care' within the Malpractice Act's meaning."). For an act to occur "during" the treatment of a patient, it must also "fall[] within the *scope* . . . of[] the treatment or care prescribed, designed, or ordered for the patient." *Id.* ¶ 66 (emphasis added). We provided a stark example of this in *Dowling v. Bullen*, where we hypothesized that the Act would not apply to a patient's tort claim for conversion based on a physician stealing the patient's wallet during a medical examination. 2004 UT 50, ¶ 11.

¶43 The Defendants argue that the facts here are distinguishable from the hypothetical in *Dowling*, because Broadbent's alleged misconduct was "inextricably intertwined with" and "more than 'only tangentially related'" to Broadbent's

provision of obstetric and gynecological care. But this is insufficient to bring the acts within the scope of the Plaintiffs' medical treatment. In *Scott*, we drew upon the theft example to explain that,

> Even if the doctor is a "health care provider" and had provided "health care" during the patient's visit, the patient's loss of cash is not an injury that originated from the provision of health care. Theft cannot reasonably be said to be an act or treatment "for, to, or on behalf of" the patient, nor in the course of or "during the patient's medical care, treatment, or confinement." Even using the broadest view of "medical care, treatment, or confinement," *there is no conceivable medical or health purpose of theft; nor is theft an omission of or a negligent version of an act that does have a medical or health purpose.* Thus, the patient's loss of the wallet does not "relate to or arise out of health care."

2021 UT 28, ¶ 69 (cleaned up) (emphasis added).

¶44 This rationale applies here. We have interpreted "during" to have not just a temporal but a substantive component. To constitute health care, an act must be within "the *scope* of the care or treatment the health care provider prescribed, ordered, designed, or carried out for the patient." *Id.* ¶ 66. In other words, the acts must have some "conceivable medical or health purpose." *Id.* ¶ 69. And the Plaintiffs allege that the conduct that caused their injuries had no medical or health purpose.

¶45 Thus, accepting the allegations in the Complaint as true, Broadbent's alleged abusive acts are not health care under the Malpractice Act just because they occurred at the time of a medical exam. Nor are they health care because Broadbent's position as an OB-GYN gave him an enhanced opportunity to commit the alleged acts under the guise of medical necessity. Certainly, this may make the claims more difficult for the Plaintiffs to prove. They will have to prove the elements of the claims they have chosen to bring, which include sexual battery, sexual assault, and intentional infliction of emotional distress. And, to use the district court's example, these claims might be easier to prove if Broadbent were a podiatrist who interrupted his treatment of the Plaintiffs' feet to engage in the alleged misconduct. But sexual assault does not fall within the scope of medical treatment regardless of whether it is perpetrated by a podiatrist or an OB-GYN.

¶46 Accordingly, we conclude that the Plaintiffs have alleged claims that are not covered by the Malpractice Act. To be subject to the Malpractice Act, the alleged injury must arise from or relate to an act that was within the scope of the patient's medical treatment and had some medical or health purpose. The point of the Plaintiffs' claims is that although Broadbent purported to be conducting medical exams and providing medical treatment, his actions were not medically necessary. They allege that his acts constitute sexual abuse, done only for his own gratification. These claims do not fall within the ambit of the Malpractice Act.[7]

## CONCLUSION

¶47 We hold that the Plaintiffs have not asserted claims within the bounds of the Malpractice Act because they do not allege injuries arising out of or related to health care provided by Broadbent. Indeed, the crux of the Complaint is that their injuries were caused by actions that were not medical treatment and had no medical purpose.

¶48 We reverse.

---

[7] In concluding that the Plaintiffs' claims were encompassed by the Malpractice Act, the district court noted that the Plaintiffs did not "summarily reject" the notion that a standard of care expert might be useful to their case. We do not intend to pre-judge evidentiary issues that might arise in this case going forward. But we note generally that where the Plaintiffs' claims do not fall within the parameters of the Malpractice Act, the nature of their claims would not change, nor would they be drawn under the umbrella of the Act, if they were to use a medical expert to help prove the elements of their claims.